**Keun–Jae MOON, Plaintiff,**

v.

**Joon Gab KWON; 43 West 32nd Street Corp., d/b/a Hotel Stanford; Beautri Realty Corp., d/b/a Seoul House; "ABC Corporation"; Stanford Hotel New York Corporation, LLC; Central Palace LLC; Han Ah Reum Inc., Defendants.**

**No. 99 CIV. 11810(GEL).**

United States District Court, S.D. New York.

Sept. 9, 2002.

---

Kenneth Kimerling, Asian American Legal Defense and Education Fund, New York City (Elizabeth B. Cooper, Marcia Griffith, Anna Meresidis, Ryan Weiner, and Jamie Mowder, Lincoln Square Legal Services, Inc., New York City, of counsel), for Plaintiff.[1]

Jeffrey A. Hill (Richard M. Zaroff and Jennifer L. Marlborough, of counsel), Wormser, Kiely, Galef & Jacobs LLP, New York City, for Defendants.

*OPINION AND ORDER*

LYNCH, District Judge.

Plaintiff Keun–Jae Moon brings this action under the Fair Labor Standards Act ("FLSA") and the New York Labor Law alleging that the defendants, acting as joint employers, failed to pay overtime wages to which he is entitled. The Court has jurisdiction over Moon's federal claims pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over Moon's state law claims pursuant to 28 U.S.C. § 1367. Moon, a Korean immigrant who speaks little English, claims that he was required by his employers to work as a maintenance man for a hotel and related businesses essentially seven days a week and virtually 24 hours per day for years, without receiving the premium pay required by federal and New York State law for work beyond the ordinary maximum work week established by law. Following a bench trial, the Court finds that Moon's claims are for the most part accurate, and

---

1. Ms. Griffith, Ms. Meresidis, Mr. Weiner, and Mr. Mowder, all law students at the Fordham University School of Law, have appeared in this action under the supervision of Mr. Kimerling and Ms. Cooper pursuant to the Student Practice Rule of this Court.

only slightly exaggerated, and concludes that under the law, he is entitled to substantial damages.

Moon's complaint originally was filed on December 6, 1999, and subsequently was amended twice. A notice of entry of default was filed as to defendant Beautri Realty Corp. on March 17, 2000. Following the completion of discovery, Moon's claims were tried before this Court at a bench trial held November 13 to 15, 2001. In accordance with the Individual Practices of this Court in civil bench trials, and without objection, the parties submitted the direct testimony of their witnesses by affidavit as well as their documentary evidence in advance of trial. Moon submitted his own affidavit (Pl.Ex. 19 ("Moon Aff.")) as well as the affidavits of Victor Sanchez, who has worked at the hotel as a bellman since 1993 (Pl.Ex. 20 ("Sanchez Aff.") ¶¶ 1–2), and Victor Tejada, who worked at the hotel as in the housekeeping department from 1991 until he was laid off in 2001 (Pl.Ex. 21 ("Tejada Aff.") ¶¶ 1–2). The defendants submitted the declarations of defendant Joong Gab Kwon ("Kwon"), the owner and manager of the Hotel Stanford (Def. Ex. T ("Kwon Decl.") ¶¶ 3, 7); Woo Jin Choi, who was employed as a senior manager at the hotel from November 1988 until July 1999 (Def. Ex. U ("Choi Decl.") ¶ 3–5), Young Bok Kwon ("Thomas Kwon"), who was a front desk clerk at the hotel from 1994 until 2000 (and is not related to defendant Joong Gab Kwon) (Def. Ex. V. ("T. Kwon Decl.") ¶ 4); Jay Young Park, who has worked as a front desk clerk at the hotel since 1995 (Def. Ex. X ("Park Decl.") ¶ 2); Ki Nam Kim, who worked as a front desk manager at the hotel from 1988 until 1995 and again from 1998 to the present (Def. Ex. W ("Kim Decl.") ¶ 2); and Nicolas Lee, who has served as the hotel's Director of Operations since 1999 (Def. Ex. Y ("Lee Decl.") ¶ 2.).

Plaintiff also relied on excerpts from the deposition testimony of Huee Kyung Kwon ("Ms. Kwon"), who is the daughter of defendant Kwon and has worked at the hotel since 1998, first as the hotel's comptroller and currently as its director of management. (H. Kwon Dep. 9–10, 15, 21.) The defendants relied upon excerpts from the plaintiff's deposition. (Moon Dep.) The parties submitted counter-designations from both depositions. All of the witnesses were cross-examined at trial. Moon testified through a Korean language interpreter, and Sanchez and Tejada testified through a Spanish language interpreter. While most of the witnesses for the defense appeared to understand English in varying degrees, all of the defense witnesses except Choi relied upon the assistance of a Korean language interpreter when testifying.

In general, the Court finds Moon's testimony credible with respect to the terms and conditions of his employment and the nature and extent of the work he performed for the defendants. While Moon understandably does not recall every last detail concerning the work he performed in particular weeks, his overall testimony concerning the work he performed is amply corroborated by documentary evidence and the testimony of other witnesses. By contrast, the Court finds the defense witnesses considerably less credible than Moon. In particular, the Court finds Kwon not to be credible in his testimony concerning his own day-to-day involvement in the operations of the hotel, the terms and conditions of Moon's employment relationship, the nature and extent of the work that Moon performed for the defendants, and his knowledge of the defendants' failure to pay Moon overtime to the extent required by law. The remaining defense witnesses, all of whom are affiliated with the defendants in one way or another (Tr. 206–07, 252, 281, 291–92, 298–99), do not credibly

refute Moon's overall account of the work he performed for the defendants.

In light of the evidence received at trial, the following constitutes this Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52.

### FINDINGS OF FACT

#### I. Parties

Plaintiff Keun–Jae Moon is a 57–year-old Korean immigrant who came to the United States in 1985 and currently lives in the Bronx. (Moon Aff. ¶¶ 3–4.) Moon has had no formal education, and does not speak or read English; he did, however, receive some training as a repairman and mechanic in Korea. (Moon Aff. ¶¶ 5–7; Tr. 38–40.) From November 1987 until August 2000, Moon worked at the Hotel Stanford, a year-round, 121–room hotel located in midtown Manhattan. (Stip.Facts.¶ 11.)

The hotel is owned and operated by defendant Stanford New York L.L.C. ("Stanford"); prior to June 1998, the hotel had been operated by defendant 43 West 32nd Street Corp. ("43 West"). (Stip. Facts ¶ 1.) Defendant Joong Gab Kwon, in turn, is a member of Stanford and the President and Treasurer of 43 West. (Stip. Facts ¶¶ 4–5; Def. Ex. T ("Kwon Decl.") ¶ 3–4.) While Kwon testified that he does not maintain an office in the hotel and does not participate in setting the conditions of employment at the hotel beyond the senior managerial level (Kwon Decl. ¶¶ 22–23), on cross-examination Kwon admitted that he regularly works out of an office in the hotel, has actively and directly participated in labor negotiations with union representatives of the hotel's non-managerial employees, and has participated directly in decisions involving the terms and condi-tions of Moon's employment, such as his day-to-day job responsibilities and his compensation, health care benefits, and housing. (Kwon Decl. ¶¶ 17, 23; Tr. 209–11, 216, 222–23; Pl. Exs. 13, 24.) Indeed, Kwon claims to have personally made the decision to hire Moon. (Tr. 216, 227.) The Court finds that Kwon plays an active, day-to-day role in the operation of the hotel, including direct supervision of employees such as Moon.

Kwon also was a shareholder of defendant Beautri Realty Corp. ("Beautri") until January 1998 and a member, the majority shareholder, and the manager of defendant Central Palace L.L.C. ("Central") until its dissolution.[2] (Stip. Facts ¶¶ 7, 9; Kwon Decl. ¶¶ 5, 17; Tr. 220.) Between 1994 and 1998, Beautri owned a residential apartment building located on the same block as the hotel and known as "Seoul House." (Kwon Decl. ¶ 17.) At all relevant times, Central owned a nearby commercial building on 41st Street near Park Avenue (the "41st Street Building"). (Tr. 219–20.) The last corporate defendant, Han Ah Reum Corp., sued herein as Han Ah Reum Inc. ("Han Ah Reum"), is owned by Kwon's brother. (Kwon Decl. ¶ 6.). Han Ah Reum operates a Korean grocery store on the same block as the hotel. (Moon Aff. ¶ 29.)

The parties have stipulated that the hotel does business within the city of New York and is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of FLSA, 29 U.S.C. §§ 206–07, and that collectively, Stanford, 43 West, Central, and Han Ah Reum also constitute an enterprise engaged in commerce or in the production of goods for commerce within the meaning of FLSA. (Stip.Facts.¶¶ 1–2.)

---

**2.** Central was formerly known as Stanford Palace L.L.C. until changing its name on Au-gust 9, 1996. (Stip. Facts ¶ 8.)

## II. *Moon's Compensation*

Moon was brought to the hotel in November 1987 by a friend and was hired as a maintenance worker after meeting with one of the hotel's managers. (Moon Aff. ¶ 9–10; Stip. Facts ¶ 10; Tr. 23.) Prior to working at the hotel, Moon had previously worked in the United States as a maintenance worker and in a grocery store, and in Korea doing plumbing and repairing refrigerators and air conditioners. (Moon Aff. ¶¶ 7–8.) Kwon maintains that he, too, interviewed Moon, even though he did not typically participate in the hiring process at the hotel, as a favor to a friend who had informed him that Moon was an orphan of the Korean War. (Kwon Decl. ¶ 10.) According to Kwon, Moon confirmed during that interview that he was a Korean War orphan and that his family had remained in Korea; after the interview, Kwon asserts, he instructed the hotel's management to hire Moon as a maintenance worker even though Moon did not have any skills. (Kwon Decl. ¶ 11.) Moon, however, disputes Kwon's account, asserting that he never had an interview with Kwon and that he is not, in fact, a Korean War orphan. (Tr. 48, 304–05.) While this factual dispute is not material to any important issues in this case, the Court credits Moon's testimony that he is not a Korean War orphan and did not meet with Kwon during his employment interview at the hotel; Kwon's lack of credibility regarding this minor matter casts some doubt on the balance of his testimony.

The parties agree that Moon never had a written employment contract with any of the defendants. (Stip. Facts ¶ 12.) Nor have the defendants preserved "a written memorandum summarizing the terms" of Moon's oral employment agreement, as federal law requires. 29 C.F.R. § 516.5(b)(4). In the absence of any written instrument memorializing the parties' intentions, the Court must infer the terms of their agreement from the entire course of their conduct, based on the testimonial and documentary evidence in the record.

### A. *Wages and Hours*

Moon testified that he initially was paid only in cash, but that the hotel began, without ever discussing the change with him, to pay his weekly salary in both cash and check in April 1988. (Moon Aff. ¶¶ 16–18.) Thereafter, Moon claims to have received small wage increases each year, typically in the form of increased cash payments of approximately $5 per week, and asserts that the hotel's management did not discuss any of these raises with him. (Moon Aff. ¶¶ 18–19.) According to Moon, his regular weekly salary from 1993 through 1999 was as follows:

| Period | Cash | Check | Total |
|---|---|---|---|
| 1993 | $207 | $461.54 | $668.54 |
| 1994 | $212 | $461.54 | $673.54 |
| 1995 | $217 | $461.54 | $678.54 |
| 1996 | $222 | $461.54 | $683.54 |
| 1997–March 1998 | $227 | $490.38 | $717.38 |
| April 1998–June 1999 | $0 | $836.54 | $836.54 |

(Moon Aff. ¶ 19.)

Moon's testimony concerning the amounts paid by check is confirmed by his paycheck receipts, a large number of which he has retained. (Def. Ex. B; Pl. Ex. 3.) As for the cash payments, these are not reflected in the W–2 forms issued by the hotel or the tax returns filed by Moon, and the defendants argue that no such cash payments ever were made. (Def.Br. 43–45.) Nevertheless, the Court credits Moon's testimony and finds that Moon was paid the weekly cash amounts that he claims. Sanchez credibly testified that he, too, was paid off-the-books in cash until he complained, and at least one hotel document also reflects that Moon was paid cash along with his check. (Sanchez Aff. ¶ 2; Pl.Ex. 6.) Moreover, after initially denying any knowledge of off-the-books cash payments by the hotel, Choi, who was responsible for payroll matters, admitted that the

hotel paid its employees cash without reporting those payments on their W–2 forms. (Tr. 230–31, 237–40, 248–49, 254–56.) In addition, as discussed below, Moon's contention that he was paid substantial amounts in cash is corroborated by the otherwise inexplicable dramatic increase in his weekly paycheck in April 1998, when he maintained that he ceased receiving cash.

For purposes of determining the parties' intentions with respect to the terms and conditions of Moon's employment, their employment relationship with the hotel may be divided into four distinct phases: (1) from the start of his employment in 1987 until early 1988, (2) from early 1988 until April 1998, and (3) from April 1998 until June 1999, and from (4) June 1999 onward.

### 1. Period One—November 1987 until Early 1988

Moon maintains that at the start of his employment in 1987, a hotel manager told him that he was to work 10 hours a day, six days a week, and that he would be paid $7 per hour for that work. (Moon Aff. ¶¶ 10, 15; Tr. 24, 42, 54.) Moon testified that he also was told that if he worked more than 60 hours per week, he would be paid $7 per hour for those extra hours. (Tr. 147; Moon Aff. ¶ 15.) The defendants dispute this contention, maintaining that Moon was told at the very outset of his employment that he was to be paid a weekly salary, based on a 60 hour workweek. According to Choi, all maintenance workers, including Moon, were paid fixed weekly salaries rather than hourly wages. (Choi Decl. ¶ 8.) The Court credits Moon's account of this initial phase of his employment relationship, and finds that he agreed to work at least 60 hours per week for an hourly wage of $7 per hour, or a total of $420 per week, with overtime payments of $7 for hours in excess of 60 per week.

### 2. Period Two—Early 1988 until April 1998

Moon testified that in early 1988, he met with Woo Jin Choi ("Choi"), the hotel's manager, and was told that because he was "making too much money," (1) his compensation would be decreased to approximately $400 per week, and (2) he no longer would be paid anything for hours in excess of 60 per week. (Moon Aff. ¶ 16; Tr. 50.) Moon states in his affidavit that he understood that he was still expected to work at least 60 hours per week, characterizing a workweek of 60 hours as his "regular schedule." (Moon Aff. ¶¶ 15–16, 31, 147.) On cross-examination, however, Moon explained further that while he was told at the 1988 meeting with Choi that he would thenceforth be paid the same amount of money each week and that he was expected to work at least 60 hours per week, he did not know or understand what the underlying basis for that weekly salary would be. (Tr. 44–46, 54.) He testified that "[w]hat I understood was ten hours [per day] and a weekly payment, but other than that, I don't know in details." (Tr. 54.) Based primarily on Moon's own testimony, the defendants maintain that (1) Moon agreed to work at least 60 hours of work each week for a weekly salary, rather than for hourly wages, and (2) the parties also intended for that salary to include an overtime premium for hours worked in excess of 40 hours per week. (Kwon Decl. ¶ 13.)

For purposes of FLSA, "[t]here is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours." *Giles v. City of New York*, 41 F.Supp.2d 308, 317 (S.D.N.Y.1999). While Moon argues that the defendants have failed to rebut this presumption, the Court disagrees and

finds that during the period from early 1988 until April 1998, the parties agreed that Moon would be paid a weekly salary in exchange for at least 60 hours of work per week. In making this finding, the Court credits Moon's own testimony that he was expected to work at least 60 hours per week, and notes further that throughout this period, Moon was in fact paid a weekly salary and consistently worked more than his "scheduled 60 hours" per week. (Pl. Exs. 6, 7; Def. Ex. B; H. Kwon Dep. 90, 98–99; Tr. 44–45; Moon Aff. ¶ 21.) While Moon's paycheck receipts, on their face, indicate that Moon was compensated for 40 hours of work each week, rather than 60 hours (Def.Ex. B), the Court credits the testimony of several defense witnesses that the notations on Moon's paycheck receipts indicating that he was being paid for only 40 hours of work per week resulted from the peculiarities of the hotel's accounting software, which automatically designated all "salaried" employees as having worked 40 hours per week.[3] (Choi Decl. ¶¶ 9–10; Lee Decl. ¶ 4; Tr. 234–35; H. Kwon Dep. 88–89.) Moon consistently testified that from the very beginning, he was expected and agreed to work regular 60–hour weeks, that his pay was intended to cover that many hours, and indeed was initially computed based on 60 hours of work at $7 per hour. Nothing in the record, including Moon's own testimony, persuasively suggests that this initial agreement changed to a 40–hour week in 1988.

At the same time, the Court also credits Moon's testimony concerning his subjective understanding—or lack of understanding—concerning the manner in which this weekly salary was to be calculated. "Unless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours." *Giles,* 41 F.Supp.2d at 317. The evidence here establishes rather clearly that while Moon understood as of early 1988 that he was henceforth to be paid a weekly salary, he did not at all understand how that weekly amount was to be calculated. In particular, no credible evidence supports a finding that Moon understood or agreed that his weekly salary would include any sort of overtime premium for work in excess of 40 hours per week. Indeed, the defendants offer no evidence indicating that *either* party to the agreement understood Moon's weekly salary to include any such overtime premium. While Kwon and Choi testified that they intended to comply fully with federal and state minimum wage and overtime laws (Kwon Decl. ¶ 13; Choi Decl. ¶ 20; Tr. 248–49), these general platitudes concerning the defendants' aspirations to comply with the labor laws, even if truthful, are not sufficient to support a more specific finding that the parties explicitly agreed to include an overtime premium in Moon's weekly salary. The Court also draws an inference concerning the defendants' intentions from Moon's credible testimony that under the terms of his *original* employment contract,

---

**3.** The Court does *not* rest this finding on the basis of any judicial admissions resulting from assertions in Moon's complaint that he agreed to be paid for a 60 hour workweek. While the defendants argue that these statements constitute judicial admissions (Def. Br. 38–39 (quoting Second Amend. Compl. ¶¶ 3, 66, 78)), at the conclusion of the trial, counsel for Moon was granted leave to amend the complaint to conform to the evidence at trial under Fed.R.Civ.P. 15(b). (Tr. 305.) Accordingly, if the evidence had shown that Moon had agreed to be paid for a 40 hour workweek, allegations in the complaint that deviated from the evidence would not have presented an insurmountable obstacle. *See Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 32 (2d Cir.2002).

agreed to less than a year before, the hotel agreed to compensate him for hours in excess of 60 per week at his normal rate of $7 per hour, not at a premium rate.

The documentary evidence submitted by the parties also tends to support an inference that the defendants did not intend for Moon's salary to include any overtime premium. As already noted, Moon's paycheck receipts on their face indicate that Moon was compensated for 40 hours of work each week, rather than 60 hours, and the defendants' only explanation for this notation is that Moon was treated by their accounting software as a *salaried* employee. While the Court credits the defendants' explanation, that testimony also supports an inference that the hotel mistakenly understood Moon to be exempt from overtime wages under FLSA altogether—an understanding directly at odds with the notion that the hotel *simultaneously* intended its employment agreement with Moon explicitly to have included any premium for overtime hours.[4] The contradictory nature of the inferences the defendants would have the Court draw from this testimony is illustrated by the 1989 version of the Hotel Stanford Employee Handbook, which informs the hotel's employees that

> [i]n order to comply with the [FLSA], we have two categories of employees:
>
> 1. *Exempt or salaried* employees who are not entitled to overtime pay and must satisfy the provisions of the [FLSA] to qualify as an Executive, Administrative or Professional exemption.
>
> 2. *Non–Exempt Hourly* employees.
>
> If you are a non-exempt *hourly* employee, you will be paid for overtime

work at the rate of 1½ times your base salary pay rate for *all hours paid over forty (40) in a work week.* The Hotel defines a *work week* as 12:01 a.m. Sunday through Midnight of the following Saturday.

(Pl.Ex. 9 ("Hotel Employee Handbook") at 5.) Neither category, however, contemplates the compensation terms that the defendants now claim that they intended: a weekly *salary* calculated to include *overtime* wages at a premium rate. There is no basis, therefore, to conclude that *either* party intended such an arrangement.

To summarize, the Court finds that while Moon agreed to a salary that would cover a 60–hour workweek during the period between early 1988 and April 1998, he clearly was confused about the manner in which his weekly wages were calculated and certainly did not agree to a particular calculation of those wages that included a premium rate for hours in excess of 40 per week. At the same time, the documentary evidence does not suggest that the defendants intended Moon's weekly salary to include any premium for overtime, and indeed more reasonably supports the opposite inference. Accordingly, the Court finds that Moon and the hotel did not agree to include an overtime premium as part of his weekly salary during the period from early 1988 until April 1998.

### 3. *Period Three—April 1998 until June 1999*

Beginning in January 1998, the hotel initiated steps that materially changed the nature of Moon's employment relationship. As of April 1998, the hotel stopped including cash with Moon's weekly checks, in-

---

4. While Congress has expressly exempted certain categories of employees from FLSA's overtime requirements, including, *inter alia,* persons "employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1); *Freeman v. Nat'l Broadcasting Co., Inc.,* 80 F.3d 78, 82 (2d Cir.1996), Moon was not employed in an "exempt" position.

stead paying his entire weekly salary by check. Accordingly, the amount of that weekly check increased over 40 percent, from $490.38 to $836.54. (Moon Aff. ¶ 19; Def. Ex. B; Pl.Ex. 3.) In addition, Moon testified that at some point between January and April 1998, a new hotel manager informed Moon that he no longer should stay for dinner or work at night, work on his days off, or respond to emergencies, and Moon asserts that his work hours decreased significantly as a result. (Moon Aff. ¶ 55; Tr. 43–44.) This testimony finds support in Moon's contemporaneous, handwritten notes, in which he summarized the maintenance and repair work he had performed each day and, in many instances, also recorded the date and approximate time.[5] Moon's notes after April 1998 indicate that he rarely performed work late in the evening during this period, and that on many occasions he left work between 7:00 p.m. and 8:00 p.m. Finally, in October 1998, the hotel began to require Moon to record his work hours using a time card, as it had required of other employees since the early 1990s. (Moon Aff. ¶ 31; Choi Decl. ¶ 7; Stip. Facts ¶ 13.)

According to Moon, his regular work schedule changed during this period from 60 hours per week to 48 hours per week (Tr. 44–45), and the Court credits this testimony. This finding finds additional support in the hotel's employment records, which are considerably more extensive in the period after April 1998, when it appears to have been trying to regularize its compensation policies. After the hotel stopped paying Moon cash and increased the amount of his paycheck to $836.54, it also on occasion indicated instances in which it purported to be paying Moon for overtime hours, sick days, and vacation days. For example:

● Each of Moon's paycheck receipts for the five weeks between May 23, 1998, and June 20, 1998, indicates that he was paid for 40 "regular" hours, totaling of $836.52, and eight "overtime" hours, for a total of $209.16. On its face, this calculation reflects compensation for "regular" hours at an hourly rate of $20.91 and for "overtime" hours at an hourly rate of $26.29. However, the amounts make much more sense if we accept Moon's testimony that his workweek was meant to include 48 "regular" hours, rather than the 40 indicated on the receipt. On that assumption, the check instead reflects compensation for 48 "regular" hours at the hourly rate of $17.42 and for eight "overtime" hours at the hourly rate of $26.29—which represents exactly one-and-one-half times the "regular" hourly rate of $17.42.

● Moon's paycheck receipt for the week ending December 12, 1998, indicates

---

**5.** Moon testified that he kept these notes, which for the most part are recorded on "Hotel Stanford" memo pads, in order to report to his supervisors when asked each day about the work he had performed. (Moon Decl. ¶ 59; Tr. 17, 19.) At trial, counsel represented that Moon kept and retained approximately 1700 pages of these notes, but that the only notes relied upon in this case are those notes that clearly reflect either (1) work outside of Moon's regular work hours, as indicated by a particular time entry, or (2) work performed at a location other than the hotel, as indicated either by the name of that location itself or other contextual details from which that loca-

tion may be inferred. (Tr. 29, 187–90.) The Court credits Moon's testimony concerning the purpose of these notes and the manner in which he used them. The physical form of the documents is consistent with Moon's testimony, and their contents are frequently corroborated by the hotel's own records or other testimony. The contents of the notes are clearly admissible as recorded recollection under Fed.R.Evid. 803(5). In a bench trial, there seems little point in adhering to the time-consuming practice of reading the notes' contents into the record rather than working more efficiently from the exhibits themselves.

that he was paid for eight "regular" hours, totaling $139.36, and 40 "vacation" hours, totaling $696.80. This calculation reflects compensation for both "regular" and "vacation" hours at a uniform hourly rate of $17.42.

- Moon's paycheck receipt for the week ending March 13, 1999—the week following his injury—indicates that he was paid for 24 "regular" hours, totaling $418.08, and 24 "sick" hours, also totaling $418.08. Again, this calculation reflects compensation for both "regular" and "vacation" hours at a uniform hourly rate of $17.42, and a total work week of 48 hours.

(Pl.Ex. 3.)

The evidence gives no reason to believe that the hotel intended to account for compensation within these various categories at different hourly rates—to the contrary, it is clear that at least with respect to vacation and sick hours, the hotel's policy was to compensate its employees at their "regular" hourly rates. (Hotel Employee Handbook at 19; H. Kwon Dep. 85–86.) However, as Moon's attorneys painstakingly and persuasively demonstrate in their post-trial brief (Pl.Br. 39–46), reconciling these numbers so as to ensure a uniform

hourly rate for regular, vacation, and sick hours only is possible when one assumes Moon's regular workweek to be 48 hours.[6] On that assumption, Moon's paycheck receipts for this period reflect compensation for regular, sick, and vacation hours at a uniform rate of approximately $17.42 per hour for a 48–hour workweek, and compensation for overtime hours beyond 48 at a premium of one-and-one-half times that normal rate.[7]

Accordingly, the Court finds that between April 1998 and June 1999, the parties intended to compensate Moon for a 48–hour regular workweek and continued to pay him a weekly salary for that work. Notwithstanding the handful of instances in May and June 1998 in which Moon's paychecks purport to indicate overtime payment for work in excess of 48 hours per week, the parties did not evidently agree to compensate Moon at a premium rate for work in excess of 40 hours per week. Because Moon's compensation for his regular 48–hour work schedule seems to have been calculated at a consistent hourly rate, and because Moon's paycheck receipts do not reflect the actual amount of overtime work that Moon performed, the Court finds that Moon's weekly salary did

6. Less persuasively, Moon also would have the Court extrapolate backwards, based on the more extensive documentary evidence available after April 1998, to find that the parties intended Moon's weekly salary to cover a 48–hour workweek even before April 1998. (Pl.Br.46.) However, the factual basis for such an extrapolation is rather dubious. The Court's finding that the hotel proposed, and Moon agreed to, a modified, 48–hour work schedule as of April 1998 is supported by Moon's testimony and evidence that Moon's employment relationship changed in tangible and material ways *around that time.* By contrast, no evidence supports a finding that the parties had agreed to a 48–hour work schedule anytime before April 1998—especially in the face of Moon's clear testimony that he expected and agreed to a 60–hour workweek as early as 1988.

7. No other agreed length of workweek for this period yields hourly rates for "regular," "vacation," "sick," and "overtime" hours that bear any plausible relationship to each other. For example, if one assumes a 60–hour workweek, as the defendants urge, then Moon's paycheck receipts for this period would reflect compensation for "regular" hours at the hourly rate of $13.94 and for "overtime" hours during the same week at the hourly rate of $26.29—a premium of almost *twice* his regular rate. There is no evidentiary basis to support a finding that the hotel intended this considerably more awkward compensation structure, in which (1) regular hours would sometimes be compensated at $13.94 per hour and sometimes at $17.42 per hour, (2) vacation and sick hours would be compensated at $17.42 per hour, and (3) overtime hours would be compensated at $26.29 per hour.

not incorporate any premium rate for overtime in excess of 40 hours per week.

### 4. *Period Four—After June 1999*

After seriously injuring himself in early 1999, Moon was transferred from his position as a maintenance worker into a less physically demanding position in housekeeping. The transfer is material to this case because the defendants maintain that housekeeping employees, unlike maintenance workers, were paid hourly wages rather than weekly salaries, and Moon only seeks damages arising from his employment as a maintenance worker. (Choi Decl. ¶¶ –10.)

While Moon offers conflicting testimony as to precisely when this transfer took place (Moon Aff. ¶¶ 12, 57; Tr. 48–49), the hotel's payroll records indicate that the weekly compensation for Joong Hyun Park, Moon's successor as the hotel's senior maintenance worker, increased during for the pay period ending June 26, 1999. (Pl.Ex. 11.) From those payroll records, the Court infers that Park assumed his new position as the senior maintenance worker during the week ending June 26, 1999, and also finds, accordingly, that Moon assumed his new position in housekeeping during that same week. Based on the defendants' own account of the hotel's payroll structure, Moon was no longer paid a weekly salary as of that pay period, but rather was paid wages based on a fixed hourly rate.

### B. *Meals and Lodging*

In addition to making monetary payments each week, the hotel also compensated Moon by providing him with meals and lodging. It is undisputed that throughout the period of his employment, the hotel provided Moon and other employees with both lunch and dinner (or reimbursed them for the cost of those meals), and that it did so for their benefit rather than its own. (Moon Aff. ¶ 20;

Kwon Decl. ¶ 19; Choi Decl. ¶ 15; Kim Decl. ¶ 5; Moon Dep. 204–05; Tr. 172–73.) The hotel did not maintain any records with respect to the fair value or reasonable cost of these meals, as required by both federal and state law. However, Moon's unrefuted testimony indicates that the defendants in fact reimbursed him $6 for lunch and between $6 and $12 for dinner if he obtained those meals on his own. (Moon Aff. ¶ 20.) Accordingly, the Court finds that the hotel provided Moon with lunch and dinner on each day that he worked, at an average cost of $6 for each lunch and $9 for each dinner.

As for lodging, Moon asserts that the hotel asked him to spend his nights at the hotel soon after he began working for them, since at the time he needed to return from his apartment in Queens when paged to respond to emergencies. (Moon Aff. ¶ 24.) While Moon initially refused to do so, he asserts that he ultimately did move to the hotel in late 1991 or early 1992, when he was instructed to take over the job responsibilities of a departed coworker, Hyun Ku Lee, who had been responsible for covering all evening maintenance work. Moon asserts that the demands of this position routinely required Lee to work past midnight, and that as a result Lee essentially lived in the hotel, sleeping in various places throughout the building including a changing room in the basement next to the boiler, where he brought a bed; in room 202 of the hotel (which he shared with the coffee shop manager); or in recently vacated hotel rooms that had not yet been cleaned. (Moon Aff. ¶ 22; Tr. 25, 125.) While Moon concedes that no hotel employee specifically told him to sleep in the basement, he asserts that the hotel managers told him to work in the same manner that Lee had worked. For that reason, when the hotel instructed Moon to assume Lee's responsibilities, he too moved

into the hotel, sleeping either in the basement, as Lee had done before him, or, if he received permission from the front desk, in a vacant room in the hotel, usually room 1009. (Moon Aff. ¶¶ 22–25; Tr. 24–25, 107–08; Moon Dep. 19, 21.)

Tejada corroborates this account of the responsibilities undertaken by both Lee and Moon, testifying that when he came to work in the morning, he would frequently find that Moon had slept in the basement laundry room, or in the sub-basement boiler room, and was just getting up. (Tejada Aff. ¶¶ 5, 8.) Tejada also testified that at times, when room 1009 was not available because the hotel was full, he helped Moon move his belongings out of the room so that it could be rented to a guest. (Tejada Aff. ¶ 7; Tr. 85–86.) Moon, too, testified that while was able to stay in room 1009 quite frequently, there were a number of occasions when neither room 1009 nor any other room was available to him because the hotel was entirely full, for example, during the tourist season or when there were merchandise shows. (Tr. 103–04.) Nevertheless, Moon testified that regardless of where in the hotel he slept, he stayed in the hotel every night from the time he assumed Lee's employment duties in early 1991 or late 1992 until September 1994, when he moved to Seoul House. (Tr. 108–09, 124.)

The defendants, on the other hand, paint a rather different picture of how Moon came to be living in the hotel. Kwon testified that Moon practically begged him to provide a place to stay in the hotel as early as his initial interview. (Kwon Decl. ¶ 12.) Kwon claims to have felt sorry for Moon and to have directed the hotel to provide room 1009 to him at no cost. (Kwon Decl. ¶ 12.) According to the defendants, the hotel staff was aware that the room had been designated for Moon's exclusive use and that no guests were to be placed in that room—which made it unnecessary for Moon to sleep in the basement or anywhere else within the hotel. (Kwon Decl. ¶ 12; Choi Decl. ¶¶ 16, 19; T. Kwon Decl. ¶ 7; Kim Decl. ¶ 7.)

Kwon's account that he provided Moon with regular, stable housing in room 1009 of the hotel simply is not credible, hinged as it is to his basic assertion that he hired Moon out of sympathy for his supposed status as a Korean War orphan. Moreover, the defendants failed to produce registration or other records, presumably readily available to the hotel, that would corroborate their account by showing that room 1009 was never rented to guests. In contrast, Tejada's testimony corroborates Moon's account that room 1009 was not permanently available to Moon. The Court credits Moon's general account that he moved into the hotel because he was instructed to assume Lee's duties, which required him to be available during the evening and night-time hours, and the Queens apartment where he lived at the time was simply too far away to perform those duties effectively and to the satisfaction of the hotel.

This does not, however, amount to a finding that the hotel *required* Moon to stay in the hotel overnight, whether in the basement or in a vacant guest room. Presumably, had Moon lived closer to the hotel, there would have been no need for him to live in the hotel, and he could have promptly come in to do overnight maintenance work whenever necessary. Moon himself admits that he was permitted to leave the hotel at night as long as he remained available and the hotel staff could page him when necessary for emergency calls. (Tr. 109–10.) Thus, the hours that Moon spent in sleep or recreation during the night were not hours in which he was "at work" on a standby basis, required to be on the premises—save for those hours when he actually was called

upon to perform particular tasks. The fact that Moon received free lodging and slept at the hotel is thus relevant to the amount of his regular compensation, but does not necessarily bear upon the number of overtime hours he worked.

Thus, the Court finds that as of January 1992, the hotel effectively renegotiated and modified the terms of Moon's employment to provide him with some form of make-shift housing in the hotel, either in a hotel room when one was available or, otherwise, in the changing room in the basement—where, helpfully, Lee had already placed a bed. As with the meals, the hotel did not maintain any records with respect to the fair value or reasonable cost of the lodging provided to Moon. But given the itinerant nature of Moon's sleeping arrangements within the hotel, the fair value of this housing cannot be assessed, as counsel for Moon urges, simply with reference to hotel's regular room rates for its guests, which Moon does not know with certainty in any event. Instead, the Court finds that the fair value of the housing provided to Moon at the hotel—necessarily an estimate, since no records were maintained—is $200 per month, or $50 per week.

After Kwon purchased an interest in the nearby Seoul House apartment building in May 1994, Moon moved into apartment 4A of that building, where he lived from September 1994 until July 1998.[8] (Moon Aff. ¶¶ 26–27; Kwon Decl. ¶ 17.) None of the material facts concerning Moon's period of residence at Seoul House appear to be in dispute. According to Moon, he moved to Seoul House at the instruction of a manager at the hotel, Mr. Hwang; Kwon confirms that he arranged Moon's housing at

Seoul House. (Moon Aff. ¶ 26; Kwon Decl. ¶ 17.) As with Moon's housing at the hotel, the Court finds that the parties effectively renegotiated the terms of Moon's employment in September 1994 to provide him with rent-free housing at Seoul House. Moon paid for utilities at Seoul House, but did not pay any rent until Kwon sold his interest in the building in January 1998. Based on the defendants' records concerning the other apartments in the building, the Court finds the market rental value of the apartment at the time to have been $650 per month. (Def.Ex. E.)

After Kwon sold his interest in the building, Moon began to pay the new owner a reduced rent of $350 per month. (Moon Aff. ¶¶ 26–27; Tr. 110–11.) According to Kwon, the new owner agreed to let Moon pay this below-market rent in exchange for Moon's agreement to provide certain cleaning services at Seoul House. (Kwon Decl. ¶ 18.)[9] In July 1998, Moon moved to the Bronx. (Moon Aff. ¶ 27.)

To summarize, the Court finds that the hotel provided Moon with meals on each day that he worked, at an average cost of $6 for each lunch and $9 for each dinner, and provided him with lodging at a fair value of $200 per month, or $50 per week, from January 1992 through August 1994 and at a value of $650 per month, or $162.60 per week, from September 1994 through January 1998. There is no evidence in the record indicating that the parties intended these meal and lodging benefits as being particularly tied to overtime hours, and certainly not as any kind of premium pay, to compensate Moon for overtime work—indeed, the hotel did not even maintain any records concerning the

8. While Moon testified that he moved to Seoul House in May 1994, the parties now agree that this move took place in September 1994. (Pl. Br. 8 n. 3.)

9. The purchaser of Seoul House is not a defendant in this case. The Court therefore need not, and does not, make any findings or conclusions about the nature of Moon's employment arrangement with that individual.

value of the meals and lodging provided to Moon. Rather, they were simply part of his regular weekly compensation.

### III. *Moon's Responsibilities*

#### A. *The Hotel*

During his employment, Moon was one of two, and at times three, maintenance workers at the hotel. (Kwon Decl. ¶ 16.) He testified that his responsibilities at the hotel encompassed a wide variety of maintenance and repair tasks, including:

- Checking each floor of the hotel twice each day for various problems, such as light fixtures in need of new bulbs, exhaust fans that needed to be turned on or off, windows that were open or unlocked, and fire safety searchlights in need of new bulbs or batteries.
- Work involving the hotel's plumbing and electrical systems, including frequent unclogging of the basement drainpipe.
- Maintenance and repair of the hotel's elevator and its boiler, which provided hot water and heat for the building and which presented frequent maintenance problems while Moon was employed at the hotel.
- Responding to complaints by hotel guests—for example, adjusting the temperature of individual guest rooms that were too hot or too cold and releasing air from individual guest room radiators when they were making too much noise.
- Maintenance and repair of appliances such as refrigerators and air conditioners.
- Ongoing maintenance and repair of the bathrooms, including tile work and unclogging of drains.
- Painting the hotel's walls.
- During the winters, shoveling snow and sprinkling salt on the sidewalk early in the morning.

(Moon Aff. ¶¶ 33–35, 37, 125–28, 144–45, 156–59.) According to Moon, the boiler required a disproportionate amount of time, especially during the winters, because it was old and frequently broke down, depriving the building of heat and hot water. (Moon Aff. ¶ 35; Tr. 26, 35, 125–28, 134–35.) Moon testified that his work on the boiler would require considerable follow-up. When he repaired the boiler in the evening, he would get up in the middle of the night to make sure it was still working, often sleeping in the boiler room for that very purpose; he also testified that the front desk staff would instruct him, in the days following a breakdown, to make sure that the boiler was still operating properly. (Moon Aff. ¶ 35; Tr. 124–25, 130.)

The defendants maintain that Moon was not expected to perform substantial maintenance on the boiler or elevator, since the hotel had 24-hour service contracts for its boiler and elevator and the front desk staff was instructed to contact the boiler company whenever necessary. (Choi Decl. ¶ 18; Lee Decl. ¶ 3; Tr. 301.) But the Court credits Moon's general testimony that the boiler had serious problems while he worked at the hotel and that, as a result, he spent a considerable amount of time performing maintenance and repair work on the boiler. Sanchez credibly corroborated Moon's account, testifying that the "first step" when there were problems with the boiler was to call Moon, and that only if the problem was very serious would the boiler company be called. (Tr. 74.) A defense witness, Thomas Kwon, confirmed that, notwithstanding any maintenance contracts the hotel might have had with outside contractors, Moon was called upon to fix certain problems with the elevator. (Tr. 280.)

Moreover, the credibility of the defense witness who spoke to the issue of the

hotel's service contracts, Nicolas Lee, is shaky. On cross-examination, Lee initially testified at trial that the hotel paid the boiler and elevator service companies a monthly fee and did not incur any additional charges when they made service calls. (Tr. 301–02.) However, less than thirty seconds later, Lee testified that the elevator and boiler service companies did charge the hotel when they made service calls. (Tr. 302–03.) An actual examination of the service contract for the hotel's boiler reveals that the hotel was required to pay labor costs for certain service calls; the hotel has produced several invoices and cancelled checks for such service calls. (Pl.Ex. 17.) Thus, the hotel did have a motive not to call the outside contractor as a first resort in dealing with boiler problems. Accordingly, the testimony of Moon and Tejada that the hotel staff would ask Moon, in the first instance, to try to resolve problem with the boiler comports with the rest of the evidence before the Court.

Nor is Moon's credibility concerning his work responsibilities undermined by the defendants' assertion that guest complaints frequently would be resolved by the bellmen themselves or by switching the guests to different rooms, and that when paged, Moon often would simply instruct the front desk staff over the phone on how to resolve a given problem, rather than coming in to resolve the problem himself. Moon testified that he sometimes instructed the bellmen on how to resolve simple problems because he was so short of time, and both Sanchez and Thomas Kwon confirm this account. (Sanchez Aff. ¶¶ 6–7; Tr. 274–75.) Certainly, during the years that Moon lived at the hotel and at Seoul House, it is not plausible that he would have routinely responded to emergency calls by phoning instructions in from the basement or down the block; Moon testified that beginning only in 1998 or 1999—after he had already moved out of Seoul House and into the Bronx—would he respond to a page by giving instructions to the hotel staff over the phone, rather than coming in to the hotel. (Tr. 159–60.)

### B. *Seoul House, the 41st Street Building, Han Ah Reum, and Kwon's Residence*

Moon testified that on many occasions, he was instructed to perform work for the defendants at several locations outside the hotel—Seoul House, the Han Ah Reum grocery store, the 41st Street Building, and Kwon's personal residence. Moon's testimony is corroborated by his handwritten notes. (Moon Decl. ¶ 59; Pl. Exs. 2, 18; Tr. 16–22, 135–38; Moon Dep. 227–68.) The work at each of these locations was performed at the direction of hotel supervisors, including Kwon himself, as well as supervisors at those particular locations. (Moon Aff. ¶¶ 26, 28–29; Tr. 27–29, 219, 250; Moon Dep. 159–70, 259–60; Tr. 111–12, 242–43, 250; Pl.Ex. 2.)

Upon Kwon's acquisition of Seoul House in May 1994, Moon was instructed by the management of the hotel to provide maintenance work for that building. Moon was first taken to Seoul House by Kwon and Choi, who instructed him to clean the floor and the roof when they went to inspect the building shortly after Kwon acquired it. (Moon Aff. ¶ 26; Tr. 27–28.) Before long, Moon was shouldering the responsibility for all of the maintenance work at the apartment building. Even though he continued to be responsible for his existing maintenance duties at the hotel, Moon was the only maintenance worker or superintendent at Seoul House, which consisted of 12 commercial and residential units on five floors. (Moon Aff. ¶ 26; Tr. 28–29, 221.) Moon's responsibilities at Seoul House, which included general repair work for building tenants, regular janitorial services, plumbing and tile work in the bath-

rooms, and collection of the garbage from the apartment building and delivery to the hotel for pickup, were assigned by Kwon and other managers at the hotel as well as a real estate agent for Seoul House. (Moon Aff. ¶ 26; Moon Dep. 159–63; Tr. 28–29.) Moon's testimony is corroborated by entries in his handwritten notes, which record well over 150 days between June 1994 and January 1998 on which he performed maintenance, repair, and janitorial tasks at Seoul House. (Pl.Exs. 2, 18.)

Kwon flatly denies that Moon ever performed *any* maintenance or cleaning services at Seoul House at all during his ownership of the building, going so far as to say that since the apartment building consisted of only a small number of low-rent studio apartments, the tenants handled their own maintenance—including cleaning of the public hallways. (Kwon Decl. ¶ 18; Tr. 220–21.) Kwon's account lacks credibility. His testimony is refuted not only by Moon's more credible testimony that Kwon himself personally instructed Moon to perform work at Seoul House, but also by Moon's recorded notes, which clearly indicate that he performed a great deal of work at the apartment building during the period in question. Moreover, it is far from clear why Seoul House—which, according to Moon, had no garbage service (Tr. 29)—would not have needed a maintenance worker during Kwon's ownership of the building, but then suddenly did require the maintenance and janitorial services of Moon himself upon Kwon's sale of the building to his friend in 1998, as Kwon himself acknowledges without explanation. (Kwon Decl. ¶ 18.) Finally, the claim that the tenants maintained not only the their own apartments but also the common areas and services of the building is implausible on its face. The Court thus finds that Moon regularly performed the work he claims to have performed at Seoul House during Kwon's ownership of the building.

Moon testified that on several occasions, he also was instructed to perform various duties at Kwon's Manhattan apartment. (Moon Aff. ¶ 28; Moon Dep. 167–70; Tr. 121.) Kwon confirms Moon's testimony, but indicates that Moon performed these tasks "on rare occasions" and during his regular work hours as an employee of the hotel. (Kwon Decl. ¶ 9.) Kwon characterizes these duties as comprising relatively minor tasks such as hanging pictures on the wall. (Tr. 219.) Moon's contemporaneous notes, however, cast serious doubt upon the credibility of Kwon's testimony. It is clear from those notes that these instances were more significant and time-consuming than Kwon would have the Court believe, including several days spent painting the apartment into the early evening and one occasion in which Moon assembled and straightened Kwon's furniture. (Pl.Exs. 2, 18.) Aside from tips from Kwon's wife, Moon was not compensated for this work. (Moon Aff. ¶ 30.) The Court credits Moon's testimony and finds that he performed this work at Kwon's residence.

Finally, Moon testified that he performed repair work on many occasions at the 41st Street Building and at Han Ah Reum at the direction of hotel personnel, including work in the early mornings before his work day the hotel began and in the evenings. (Moon Aff. ¶ 29; Tr. 250–51; Pl. Exs. 2, 18.) Moon first was brought to the 41st Street Building by Kwon and Choi, and he subsequently went to that site very often—indeed, he testified that he ultimately purchased three bicycles (the first two having been stolen) for the specific purpose of traveling to the 41st Street Building to do work before starting his regular workday at the hotel. (Moon Aff. ¶ 28; Tr. 118–120.) The bulk of this work entailed routine checks of the locks and security at the building, which Moon did not record in his daily notes. Less

routine matters, such as errands for Kwon and instances in which he unlocked the building to show it to visitors and, after a nearby break-in, to the police, are recorded in Moon's notes. (Pl.Exs.2, 18.)

Moon's tasks at Han Ah Reum, the grocery store owned by Kwon's brother, included work on the store's electrical and plumbing systems. (Tr. 111; Moon Dep. 165–67; Pl Exs. 2, 18.) Choi testified that this work usually was done at the direct request of Han Ah Reum's manager, who "frequently" came by the hotel to ask Moon to perform this work "after work hours." (Tr. 250.) Aside from being given some food on occasion at Han Ah Reum, Moon was not compensated for his work at Han Ah Reum or the 41st Street Building. (Moon Aff. ¶ 30.) The Court credits Moon's testimony and finds that he performed the work that he claims at the 41st Street Building and Han Ah Reum.

## IV. *Moon's Hours of Employment*

### A. *Regular Hours*

When Moon first started working at the hotel, his regular work hours were from 8:00 a.m. until 6:00 p.m., six days per week. (Moon Aff. ¶ 15; Kwon Decl. ¶ 15; Choi Decl. ¶ 13; Tr. 23–24, 42, 147.) However, Moon contends, and the Court finds, that his work for the defendants—whether at the hotel, Seoul House, Kwon's residence, the 41st Street Building, or Han Ah Reum—routinely extended beyond these allotted hours, requiring him to work during the evening and night-time hours and on his weekly days off. The defendants maintain, to the contrary, that only rarely did Moon perform any work outside of his regular hours.

Precisely calculating Moon's hours of employment presents the Court with a significant challenge, since the defendants

have failed to create and maintain adequate payroll records for Moon. FLSA and its implementing regulations require an employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by [the employer]." 29 U.S.C. § 211(c). Specifically, an employer is required to maintain and preserve records for each employee of, *inter alia*, (1) the total daily and weekly hours worked, (2) the regular hourly rates of pay for each week in which overtime compensation is due, (3) the total daily and weekly earnings, (4) the total wages paid, and (5) the total weekly premium pay for overtime hours. 29 C.F.R. §§ 516.2, 516.5.[10] These requirements are not mere technicalities, but substantive obligations that are "fundamental underpinnings" of FLSA and critical to ensuring the statute's effectiveness, for an employer's "[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations." *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 607 (5th Cir.1966). *See also Mendez v. Brady*, 618 F.Supp. 579, 591 (W.D.Mich.1985) (noting that employers' failure to keep accurate and reliable employee records in violation of analogous provisions of the Farm Labor Contractor Registration Act is not "a mere 'technical' violation").

In this case, the Court finds that with the exception of W–2 forms (Def.Exs. H–M), the hotel maintained no payroll records at all for Moon prior to June 27, 1998. (Moon Aff. ¶ 31.) While other hotel employees were required to record their hours using a time clock, Moon testified that he was not told to use the time clock until October 1998—in fact, the defendants concede that the hotel has no time cards

---

**10.** New York law imposes similar recordkeeping obligations. N.Y. Lab. L. §§ 195, 661; N.Y. Comp.Codes R. & Regs. tit. 12, § 138–3.1.

recording Moon's work hours prior to the week of October 18, 1998. (Moon Aff. ¶ 31; Choi Decl. ¶ 7; Stip. Facts ¶ 13; Pl. Exs. 1, 10.) Moreover, the hotel's payroll records are inaccurate, failing, for example, to reflect cash payments before 1998 and indicating compensation for a regular work schedule of 40 hours per week, rather than his actual schedule of 60 or 48 hours per week. Although the defendants insist that they made every effort to comply with federal and state laws, including their respective recordkeeping requirements (Kwon Decl. ¶¶ 13–14; Tr. 230, 248–49), the Court finds this testimony inconsistent with the documentary evidence and the credible testimony of other witnesses. Accordingly, the Court finds that the defendants either knowingly violated or, at minimum, acted in reckless disregard of these recordkeeping requirements.

■ Ordinarily, an employee seeking to recover unpaid minimum wages or overtime under FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). However, when an employer fails to maintain records concerning the employee's wages, hours, and other terms and conditions of employment as required by FLSA, the plaintiff may carry out this burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.; see Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir.1997). While the defendants suggest that at least with respect to Moon's night-time work hours, they may avoid the burden-shifting framework set forth in *Mt. Clemens Pottery* because the hotel's log book adequately records the instances in which Moon responded to overnight emergency calls

(Def. Br. 16–17 n. 11.), the Court emphatically disagrees. The hotel's log book—which is missing altogether for the period between February 28, 1994, and January 4, 1996, and, according to the testimony of two defense witnesses, does not record every instance in which Moon responded to emergency calls (Stip. Facts ¶ 15; Tr. 283)—comes nowhere close to satisfying the detailed recordkeeping requirements of FLSA and its implementing regulations.

Accordingly, the Court denied the defendants' motion, at the conclusion of the plaintiff's case, for partial judgment as a matter of law under Fed.R.Civ.P. 52(c), finding that Moon had satisfied his initial burden under *Mt. Clemens Pottery* to "prove[ ] that he has in fact performed work for which he was improperly compensated and ... [to] produce[ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, and that the burden therefore had shifted to the defendants "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence," *id.* (Tr. 262.) The findings of fact that follow concerning Moon's hours of employment are therefore made by applying the *Mt. Clemens Pottery* framework: the "amount and extent of that work," though necessarily approximate, is calculated "as a matter of just and reasonable inference" from the evidence submitted by the plaintiff except to the extent refuted by the defendants. *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187.

The Court generally finds the defense witnesses not to be credible in their attempts to refute Moon's account of the nature and extent of his employment. As tentatively indicated at trial, the defen-

dants have effectively refuted some of Moon's more ambitious attempts to link his hours for specific weeks to his specific recollections of other events, such as the weather or construction schedules at the hotel. (Tr. 148–55.) Nevertheless, the Court does find Moon credible in his overall account that he routinely worked for the defendants for much longer than his scheduled 60 hours—in the evenings, overnight and in the early mornings, and on his days off. Especially given their overall lack of credibility, the witnesses for the defense do not effectively refute Moon's general account of his work schedule.

The Court also credits Moon's *general* account that the extent of this work was to some extent seasonal. In particular, Moon testifies that during the winter months, when it was colder, the boiler generally required more of his time and attention than it did during other times of the year, when the boiler was in use only to provide the building with hot water, not to provide it with heat. (Moon Aff. ¶¶ 33, 42; Tr. 148–49.)[11] While this general recollection cannot support findings that Moon worked specific numbers of hours during specific weeks, the Court does find the general recollection to be credible and sufficiently reasonable to support, "as a matter of just and reasonable inference," *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, a finding that Moon's work hours were longer during the colder months of winter than they were during the other times of year. However, Moon characterizes the cold weather months as having extended from the last week in October through the end of May. (Moon Aff. ¶ 42.) Taking judicial notice of overall patterns in the local climate, the Court rejects this characterization, which encompasses more than half the year. Accordingly, the Court finds

that the seasonal increase in Moon's work hours resulting from the need to perform more work on the boiler extended from the beginning of November to end of March.

**B.** *Evening Hours*

Moon testified that from early 1992, when he moved into the hotel, through early 1998, he routinely worked until 10:30 p.m., rather than ending his work day at 6:00 p.m. as scheduled. (Moon Aff. ¶¶ 37–54.) During the winter months, this work day was somewhat longer, requiring him to remain at work until midnight approximately three days per week. (Moon Aff. ¶¶ 41–42, 45–47, 50–51, 54.) At many points during his employment at the hotel, Moon was the only maintenance worker on the payroll, and even when other maintenance workers were employed by the hotel, they typically left work by 7:00 p.m., leaving Moon as the only maintenance worker available to perform work during the evenings. (Tr. 122–23, 143–44, 253; Pl. Exs. 15–16.)

According to Moon, he typically would finish his daytime maintenance tasks at approximately 7:00 p.m. or 8:00 p.m., at which time he would take a short break for dinner. After dinner, he would check with the front desk about any reported problems that need attention; at approximately 9:00 p.m. or 10:00 p.m., depending on what other work needed to be done, he would check each of the guest floors, as he had in the morning, for maintenance and security problems; these inspections took place at the instruction of his managers. When his "normal day" ended at approximately 10:30 p.m., he would go to a vacant guest room or the basement, where he would remain for the rest of the night unless he subsequently received an emergency call. (Moon Aff. ¶¶ 24, 37; Tr. 144–45, 156–57.)

---

**11.** Sanchez testified to the same effect, noting that "[p]articularly in the winter [hotel guests] often call" to seek adjustments in the temperature because their rooms are either too hot or too cold. (Tr. 72.)

Moon's basic account of his evening maintenance and repair tasks is confirmed by entries in his own handwritten notes and in the hotel log book. (Pl. Exs. 2, 8, 10; Pl. Suppl. Ex. 2; Def. Ex. C.) After he moved to Seoul House in September 1994, this routine changed somewhat, but not in a manner that affected his work hours. Moon testified that after moving to Seoul House and being instructed to perform maintenance and janitorial responsibilities at that building, he generally would work at the hotel until 8:00 or 9:00 p.m., go to Seoul House to work there for approximately one hour, and then return to the hotel to check on any maintenance problems before finally returning to Seoul House at approximately 10:30 p.m. to go to sleep for what remained of the night. (Moon Aff. ¶¶ 26, 39; Tr. 111–12.)

The defendants question whether Moon regularly performed any of the evening work to which he testified other than the occasional emergency call. According to the defendants, Moon was not required to remain at the hotel after 6:00 p.m., since none of the maintenance workers were responsible for performing maintenance duties during the evening or night-time except when specifically paged to respond to emergency calls. (Stip. Facts ¶¶ 14, 16; Kwon Decl. ¶ 15.) While Moon testified that he regularly checked the guest floors in the evenings for various problems (Tr.

156–58), the defendants claim that the hotel had a policy prohibiting hotel employees from being on the guest floors after 6:00 p.m., except in the event of an emergency, and employed a 24–hour security guard responsible for security issues on the guest floors. (Kwon Decl. ¶ 15; Choi Decl. ¶ 11.) The defendants also maintain that hotel policy required all overtime work to be approved by a supervisor, and that nobody required Moon to work during the evenings—Moon was free to leave the hotel premises in the evening and in fact frequently did so.[12] (Choi Decl. ¶ 17.)

Accordingly, the defendants maintain that when Moon did remain at the hotel in the evenings, it was for his own personal reasons—including, quite simply, the fact that until September 1994 he was living in the hotel. (Choi Decl. ¶ 14; Kim Decl. ¶ 8.) The defendants contend that Moon frequently spent evenings in the basement of the hotel eating dinner and consuming alcohol with coworkers and friends, but rarely worked during these hours. (Kwon Decl. ¶ 21; T. Kwon Decl. ¶ 8; Kim Decl. 5–9; Park Decl. ¶ 6; Tr. 172–73, 244, 277–78.) Indeed, one witness, Thomas Kwon, testified that Moon frequently was too inebriated to perform work late at night when it was requested of him. (T. Kwon Decl. ¶ 8; Tr. 278.)

The Court does not find this evidence sufficiently credible or persuasive to rebut

---

12. In yet another curious sideshow to the main event in this case, the defendants also contend that in 1997 or 1998, Moon and his girlfriend opened a fish market and that Moon often would leave the hotel for several hours at a time to work at this fledgling business. (T. Kwon Decl. ¶ 10; Kwon Decl. ¶ 20.) The defendants argue that this evidence concerning the fish market refutes Moon's testimony concerning the extent of his work at the hotel. However, there is essentially no dispute with respect to this fish market. The only defense witness to offer a precise date concerning when Moon became involved with this venture, Thomas Kwon, as-

serts that Moon opened this fish market in or around May 1998. (T. Kwon Decl. ¶ 10.) Moon's own testimony is not to the contrary. He acknowledged that he and his girlfriend opened the fish market in 1997, but explained that he was not actively involved in the venture before 1998—when, as discussed above, his work at the hotel was tapering off in any event. (Tr. 100–01; Def. Ex. G.) Especially since the defendants make no effort to quantify the time Moon supposedly spent working at the fish market, rather than the hotel, the Court does not deem this contention sufficient to refute Moon's testimony concerning the hours he spent working at the hotel.

the presumption in favor of Moon's credible testimony concerning the extent of his evening work. Moon testified that the hotel's policy concerning evening work on the guest floors was not communicated before 1999. (Tr. 128–29.) The Court credits this testimony and accordingly finds that this policy either did not exist or was not enforced before then. Similarly, with respect to the alleged policy requiring supervisory approval of overtime, the Court finds that this policy either did not exist, was not enforced, or—at minimum— was not meant to apply to Moon, who was compensated based on a weekly salary until 1999. The hotel did not even keep track of Moon's work hours until it instructed him to use the time clock in October 1998, and Choi acknowledged that the evening and night-time front desk staff members did not need to need approval before calling Moon to work. (Moon Aff. ¶ 31; Choi Decl. ¶ 7; Stip. Facts ¶ 13; Tr. 245.) The hotel has not produced any requests for overtime submitted by Moon, even for the few weeks in May and June 1998 when, according to Moon's paycheck receipts, the hotel actually purported to be paying him overtime. (Stip. Facts ¶ 17; Pl.Ex. 3.)

As the defendants argue so vigorously, *see supra*, Moon's weekly salary was constant no matter how many hours he actually worked. (Choi Decl. ¶ 10.). There is no basis to find, therefore, that the defendants wanted or expected Moon to limit his work schedule to 60 hours per week or to obtain approval to work longer than that. To the contrary, Moon's testimony indicates that when Moon left the hotel premises in the evenings for any significant period of time, he ran the risk of getting in trouble with his supervisors. (Tr. 108–09; 171–72.) The Court finds that the defendants either actively instructed him to work for more than his regular schedule of 60 hours or, at minimum, did not seek to prevent him from doing so.

In his post-trial brief, Moon attempts to infer from his handwritten notes the average time that he left work in the evening, based on a review of those notes that explicitly indicate either the time he left work or the time of his last recorded evening task. (Pl. Br. 23; Pl. Suppl. Ex. 2.) At least based on this subset of his notes, the average time that Moon completed his evening tasks appears closer to 9:30 p.m., representing an additional three-and-one-half hours more than his regular 10 hour work day. (Pl. Suppl. Ex. 2; Pl. Br. 23.) Urging the Court to consider this estimate in conjunction with the evening work that he performed at Seoul House, Moon asks the Court to find that he performed approximately four hours of work each evening above and beyond his regular schedule, which is an estimate slightly lower than the four-and-one-half hours to which Moon testified, but nevertheless in general accord with his testimony. (Pl.Br. 23.) Accordingly, the Court accepts this estimated time at which Moon typically completed his evening work between January 1992 and April 1998 "as a matter of just and reasonable inference," *Mt. Clemens Pottery*, 328 U.S. at 687, 66 S.Ct. 1187, and, based on Moon's credible testimony that he often needed to stay at work later than usual during the winter, finds that the winter months required him, approximately three days a week, to stay an additional five hours above and beyond his regular schedule.[13]

---

**13.** The Court credits Thomas Kwon's testimony that on occasion Moon's work capacity was impaired by alcohol. However, this does not affect the calculation of overtime hours worked. No defense witness offered a serious estimate of the frequency of such dereliction, and at any rate, the issue is how many hours Moon worked, not how effectively he performed. The testimony that Moon was some-

As already noted above in connection with the terms and conditions of his employment, Moon testified that his schedule changed dramatically at some point between January 1998 and April 1998. A new hotel manager informed Moon that he no longer should stay for dinner or work at night, work on his days off, or respond to emergencies, and Moon asserts that his work hours decreased significantly as a result to approximately 64 hours per week. (Moon Aff. ¶ 55; Tr. 43–44.) Moon infers this figure from time cards for the period between October 1998 and March 1999, which reflect a schedule that he claims to be typical of the entire period. (Pl.Exs. 1, 10.) The Court accepts this inference and Moon's 64 hour per week figure, and in accordance with its earlier finding concerning the point in time at which Moon's regularly scheduled hours were modified from 60 to 48 hours per week, finds that the change in Moon's actual schedule also took place in April 1998. From October 1998 until his transfer to housekeeping in June 1999, Moon's work hours by and large may be determined directly from the time cards themselves.[14] (Pl.Exs. 1, 10.) The Court finds that these time cards accurate reflect the work that Moon actually performed during this period; for those few weeks in which no time cards are available, the Court finds that Moon worked 64 hours.

To summarize, the Court finds, "as a matter of just and reasonable inference" from the evidence, *Mt. Clemens Pottery,*

328 U.S. at 687, 66 S.Ct. 1187, that between January 1992 and April 1998, Moon worked every evening, on average, an additional 4 hours above and beyond his regularly scheduled 10 hour work day, for a total of 84 hours per six-day week. The Court also finds that during the winter months of November, December, January, February, and March, this evening work extended, on average, an additional five hours above and beyond his regular schedule for three days each week, for a total of 87 hours per week. With respect to the period from April 1998 to October 1998, the Court finds that Moon worked 64 hours for the entire week, incorporating only a modest four hours per week of evening work. The Court also finds that for the period after October 1998, Moon's time cards accurately reflect his work hours.

C. *Night-time and Early Morning Hours*

Moon testified that he frequently was called to perform work during the night-time hours, after he already had completed his evening work responsibilities, and the Court credits this *general* assertion, which is supported by the credible testimony of Sanchez and Tejada (Sanchez Aff. ¶¶ 6–7). However, Moon's testimony, while credible, provides only limited guidance with respect to the frequency and extent of this night-time work. He claimed that while he was living at the hotel from January

times too drunk to perform tasks he was assigned in fact corroborates his basic account: Thomas Kwon's concern about Moon's evening drinking was precisely that he was drunk *on the job,* when he was expected to be available to work. If Moon was frequently intoxicated, he could have been fired or disciplined, but he was not; the Court infers that to the extent such incidents occurred, they did not significantly affect the total number of hours he worked for the defendants.

14. In a handful of instances, these time cards are not stamped with either the starting or ending time for Moon's work day. Based on Moon's average starting and ending times during the period between October 1998 and June 1999, the Court finds, "as a matter of just and reasonable inference," *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, that where no starting or ending time is indicated, Moon started his work day at 9:00 a.m. and ended his work day at 7:30 p.m.

1992 until September 1994, he was essentially on 24 hour duty, frequently called upon to work on the boiler and often sleeping in the basement in order to follow up on that work. (Moon Aff. ¶ 36.) Because he was sleeping at the hotel, and often could not sleep well because he was either working or sleeping near the boiler, Moon claims to have worked 153 hours per week during this period—an average of almost 22 hours per day. (Moon Aff. ¶ 36.)

This estimate is problematic. Moon makes no effort in his testimony to distinguish between the time he spent at night working and the time he spent waiting or sleeping in the hotel—which, after all, was his home at the time—or to quantify the frequency and extent of his night-time work assignments. The Court simply does not find it plausible, "as a matter of just and reasonable inference" from the evidence, *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, that Moon worked 22 hours per day, day in and day out, for over two and a half years. Nor, as noted above, can this time be counted as time spent waiting for assignments. The hotel did not require Moon to live in the hotel, or to remain at work all night on stand-by status, but merely asked him to return to work occasionally, as needed, and provided him with accommodations to facilitate such return.

Moon's testimony for the remaining period of his employment at the hotel suffers from similar problems. While Moon makes general estimates concerning the amount of time he spent on emergency night-time assignments during particular weeks (Moon Aff. ¶¶ 39–54), Moon's general assertions cannot, by themselves, plausibly support such specific estimates. The testimony concerning Moon's night-time work offered by other witnesses is also of limited utility, at least standing alone. As with Moon's evening work, the defendants rely heavily on their generalized assertion

that Moon rarely, if at all, was required to perform work beyond his regularly schedule hours (Kwon Decl. ¶ 15; Choi Decl. ¶ 14; Thomas Kwon Decl. ¶¶ 12, 14; Park Decl. ¶ 10)—an assertion that the Court does not find credible. Specific estimates of the frequency and extent of Moon's night-time work do come from Sanchez, who claims that Moon responded to emergency calls approximately twice per week (Sanchez Aff. ¶ 7); Park, who claims that Moon responded to emergency calls approximately 1–2 times per month, in each instance working for no more than an hour (Park Decl. ¶ 11); Thomas Kwon, who testified that he paged Moon approximately three times per month (Tr. 277); and Kim, who testified that he paged Moon less than five times per year (Kim Decl. ¶ 9). These estimates, however, are simply too vague—and too all over the map—for the Court meaningfully to evaluate standing alone.

A more useful indication of the nature and extent of Moon's night-time work comes from a review of Moon's handwritten notes and the hotel's log book. (Pl Exs. 2, 8, 10; Def. Ex. C.) While neither set of documents is complete, both make clear that Moon performed substantial night-time work, and that these tasks varied in complexity and in the time required of him. A review of Moon's handwritten notes reveals 78 separate entries, occurring on 69 separate days, in which Moon performed night-time work between June 1994 and April 1998—an average of between one and two calls per month for the 47 month period. (Pl. Exs. 2, 18; Pl. Suppl. Ex. 2.) A similar review of the hotel's log book reveals 11 additional night-time entries—that are not found in Moon's notes—between May 1996 and December 1997. (Pl.Ex. 8.) Given that neither set of documents faithfully records every instance in which Moon performed night-time or early morning work, the

Court finds this documentary evidence, taken together with the testimony of Moon and other witnesses, sufficient to support a finding that Moon was required to perform night-time work three times per month, on average, between January 1992 and April 1998. Since this night-time work ranges in complexity from tasks requiring a few minutes, such as temperature adjustments in individual guest rooms, to much more extensive work, typically on the boiler, lasting several hours, the Court finds that these tasks on average required one hour of work on each occasion.

Moon also claims that he regularly worked in the early morning hours, prior to beginning his work at the hotel at 8:00 a.m., at the 41st Street Building. (Moon Aff. ¶ 28; Tr. 119–20.) While the Court does not doubt that Moon performed this work, unlike Moon's night-time work at the hotel, there is no independent documentary evidence to confirm the timing of this work. The Court is satisfied that its findings with respect to the evening hours amply account for the likelihood that Moon's work at the 41st Street Building lengthened his work day and forced him to stay later in the evening, and accordingly does not find that he worked any additional hours during the early mornings.

As already noted above, Moon testified that as of April 1998, his regular work schedule decreased to 48 hours per week, his actual work hours decreased to approximately 64 hours per week, and he no longer was required to respond to emergencies. The 16 additional hours per week over and above his regular schedule already have been accounted for as "evening" hours, and Moon's time cards for the period running from October 1998 do not indicate any night-time work. Accordingly, the Court finds that Moon did not work any night-time or early morning hours after April 1998.

To summarize, the Court finds that between January 1992 and April 1998, Moon was required to work three times per month, for an average of one hour in each instance, on emergency night-time calls. The Court does not find Moon to have performed any additional early morning work before the start of his work day at the hotel that has not already been accounted for. Finally, the Court finds that Moon performed no night-time work after April 1998.

### D. Days Off and Vacation Days

As indicated above, Moon's regular work schedule formally required him to work only six days a week. However, Moon testified that he routinely worked on his "day off" as well, largely because the other maintenance workers with whom he worked over the years usually had less experience. Moon's weekly day off was not ordinarily during the weekend, when the hotel was busier, but rather on a weekday that changed from week to week. (Moon Aff. ¶ 38; Tr. 101–02, 134; Moon Dep. 73.) According to Moon, he worked on his days off from the time he moved into the hotel until early 1998, when the new hotel manager informed him that he no longer would be required to work on his days off. (Moon Aff. ¶¶ 38, 55.)

Moon claims that when he came into work on his days off, he typically would work in the morning from approximately 8:00 a.m. or 8:30 a.m. until noon, and then would take a break for lunch and several hours off. He would then return to the hotel at approximately 6:00 p.m. or 7:00 p.m. and work until 10:00 p.m. or 11:00 p.m., since he usually was the only maintenance person available during the evenings, even on his days off; he also was called in for emergencies overnight when necessary. (Moon Aff. ¶ 38; Tr. 134.) Tejada's testimony corroborates Moon's ac-

count. He testified that while his own days off constantly changed, he always saw Moon working at the hotel—whenever Tejada was working there, Moon also was working there. (Tejada Aff. ¶ 6; Tr. 82–84.) Unlike the work Moon claims to have performed during the evening and night-time hours, which they challenge vigorously, the defendants offer no evidence at all to challenge Moon's testimony concerning the work he claims to have performed on his days off and during his vacations, other than their general assertion that Moon only rarely worked beyond his regular 60 hour workweek. The Court finds that the evidence demonstrates, by "just and reasonable inference," that between January 1992 and April 1998, Moon worked seven hours each week on what should have been his day off.

Finally, Moon asserts that while he was entitled to three weeks of paid vacation, the defendants frequently required him to work during his vacations. (Tr. 95–97, 101–02.) The Court finds Moon's testimony on this issue to be truthful, but vague, failing to identify with much precision the extent to which he might have been required to work during his vacation. Moon testified that he worked during his vacation in 1992, 1993, 1994, and 1996, and that he used most of his vacation time in 1995, 1997, 1998, 1999, and 2000. (Tr. 96–97.) The documentary evidence offers only limited corroboration of Moon's testimony. Moon's paycheck receipts confirm that he was compensated for three weeks of unused vacation time at the end of 1996. (Def. Ex. B.; Pl.Ex. 3.) At the same time, his handwritten notes confirm that in 1997 he did perform relatively limited work in four particular instances (on March 9, June 28, June 30, and July 1) during what was to have been his vacation, and based on a review of those notes, the Court estimates this work to have encompassed 20 hours. (Pl.Exs.2, 18.) However, no other documentary evidence gives any sug-gestion concerning the extent to which defendants might have required Moon to work during his vacation.

Accordingly, the Court finds, "as a matter of just and reasonable inference," that the defendants ordinarily permitted Moon to take three weeks of paid vacation and that Moon used all of that vacation time in 1995, 1998, and 1999, making it unnecessary for Moon to work overtime during those three weeks. While the Court finds that Moon was required to work during part of his vacation in 1997, there is no evidence that the hotel failed to compensate him for these 20 regular hours of work, and given the limited extent of that work, it remained unnecessary for the hotel to pay him overtime during the three weeks in 1997 designated for his vacation. The Court also finds that in 1993, 1994, and 1996, Moon did not take any vacation and was paid for that unused vacation time at the end of the year.

### E. *Summary*

Adding the time that Moon worked during the evening and night-time hours and on his days off to his regular schedule, the Court finds, "as a matter of just and reasonable inference" from the evidence, *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, that between January 1992 and April 1998, Moon worked a total of 91 hours per week, comprising work during his regular schedule for 60 hours per week, work during the evenings for 24 hours per week, and work during what would have been his day off for seven hours per week. The Court also finds that during the winter months of November, December, January, February, and March, Moon worked an additional three hours each during the evenings on account of more activity involving the boiler, for a total of 94 hours per week. Moon also responded during this period to an average of three, one-hour night-time

emergency calls per month, representing a total of three hours per month, or three-quarters of an hour per week. Finally, Moon was required to work this same schedule during his vacation time in 1993, 1994, and 1996, but was not was not required to work any overtime during his three weeks of paid vacation in 1995 and 1997.

With respect to the period from April 1998 to October 1998, the Court finds that Moon worked an average of 64 hours for the entire week, incorporating no work on night-time emergency calls or on his day off. The Court also finds that Moon's time cards accurately reflect his work hours for the period between October 1998 and December 1999, and that he took three weeks of paid vacation in both 1998 and 1999 during which he was not required to work any overtime.

### CONCLUSIONS OF LAW [15]

Moon claims that the defendants violated FLSA, by failing to pay minimum wage and overtime (Second Amend. Compl. ¶¶ 65–70), and the New York Labor Law, by failing to pay minimum wage, overtime, and a premium for days in which his so-called "spread of hours" exceeded 10 hours. (Second Amend. Compl. ¶¶ 71–79.) He maintains that the defendants are jointly and severally liable for these violations, and that because these violations were willful and in bad faith, he is entitled to both compensatory and liquidated damages.

### I. *Failure to Pay Minimum Wage and Overtime*

FLSA, which was enacted in 1938, embodies a "a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees cov-

ered by the Act." *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 602, 64 S.Ct. 698, 88 L.Ed. 949 (1944); *Reich v. New York City Transit Auth.,* 45 F.3d 646, 648 (2d Cir.1995). The statute requires employers to pay each employee "who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce," a minimum hourly wage, which ranged from $3.35 per hour to $5.15 per hour during Moon's period of employment at the hotel. 29 U.S.C. § 206(a). FLSA also requires employers to pay such employees at a premium rate "not less than one and one-half times the regular rate at which he is employed" for any hours worked in excess of forty per week. 29 U.S.C. § 207(a)(1); *Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 31 (2d Cir.2002).

New York law imposes similar overtime requirements, requiring employers to pay their employees "for overtime at wage rate of 1 ½ time the employee's regular rate" for hours worked in excess of 40 hours for nonresidential employees, and in excess of 44 hours for residential employees. N.Y. Comp.Codes R. & Regs. tit. 12, § 138–2.2. Moon was a residential employee within the meaning of New York law from January 1992, when he first moved into the hotel, through January 1998, when Kwon sold his interest in Seoul House. *See* N.Y. Comp.Codes R. & Regs. tit. 12, § 142–2.1 (defining "residential employee" as an employee who lives on the premises of the employer).

#### A. *Compensable Hours*

As already discussed above, Moon has satisfied his burden under *Anderson v. Mt.*

---

**15.** The Court adopts herein any finding of fact previously set forth that might more properly be deemed a conclusion of law. *Archie v.*

*Grand Cent. P'ship, Inc.,* 997 F.Supp. 504, 524 (S.D.N.Y.1998).

*Clemens Pottery* of proving "that he has in fact performed work for which he was improperly compensated and ... produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), and with the exceptions and qualifications noted above, the defendants have largely failed in their effort to refute this evidence. However, the defendants dispute not only whether Moon has in fact performed maintenance and repair activities for the defendants to the extent that he claims, but also whether, as a matter of law, all of Moon's hours are compensable under the statute as "work" at all.

■ FLSA defines the term "employ" broadly to mean "to suffer or permit to work." 29 U.S.C. § 203(g). Similarly, New York law defines "employed" as "permitted or suffered to work." N.Y. Lab. L. § 2(7). Accordingly, work that is not requested by an employer, but is nevertheless "suffer[ed] or permit[ted]," is compensable work time under both statutes. 29 C.F.R. § 785.11. It follows that even if Moon had violated hotel policies concerning supervisory approval of overtime and the performance of evening work on the guest floors—policies that the Court already has found not, in fact, either not to have existed, not to have been enforced, or not to have been communicated to Moon—his work nevertheless would remain compensable under FLSA. As the Department of Labor's regulations interpreting FLSA explain, if an employer does not want an employee to perform work, then

it is the duty of management to exercise its control and see to it that the work is not performed .... It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.[16]

29 C.F.R. § 785.13; *see also U.S. Dep't of Labor v. Cole Enters., Inc.,* 62 F.3d 775, 779–80 (6th Cir.1995) (holding that pre- and post-shift work performed by restaurant servers is compensable notwithstanding restaurant's supposed policy of not requiring such work).

However, FLSA contains no explicit definition of what constitutes "work" itself, *New York City Transit Auth.,* 45 F.3d at 649, and the defendants argue that much of the time spent by Moon at the hotel during the evenings and at night did not constitute "work" under FLSA at all, since Moon was free to leave the hotel as long as he remained available to respond to emergency calls made via his hotel-issued pager. The defendants maintain that while Moon may have physically been present in the hotel in the evenings and overnight, this fact by itself does not establish that he was working, since he lived in the hotel for much of the time in question and spent most evenings eating and drinking with coworkers and friends in the basement. Accordingly, the defendants argue that the time Moon spent waiting for assignments in the evenings and at night is not compensable time under FLSA.

---

**16.** While the Department of Labor's interpretive regulations lack the binding force of law, they are entitled to "some deference," with the weight to be afforded such an interpretive regulation depending upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Freeman v. Nat'l Broadcasting Co., Inc.,* 80 F.3d 78, 84 (2d Cir.1996) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). However, the defendants do not challenge any of the interpretive regulations cited by Moon, and the Court is satisfied that they interpret the statute correctly.

■ In considering the defendants' arguments, we must bear in mind the Supreme Court's admonition that because FLSA's provisions "are remedial and humanitarian in purpose," the statute therefore "must not be interpreted or applied in a narrow, grudging manner." *Tenn. Coal, Iron & R.R. Co.*, 321 U.S. at 597, 64 S.Ct. 698. The Supreme Court has interpreted the statutory term "work" to encompass not merely "physical or mental exertion," *id.*, 321 U.S. at 598, 64 S.Ct. 698, but rather any hours "which the employee is required to give his employer." 29 C.F.R. § 785.7. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944) ("[A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen."); 29 C.F.R. § 778.223 (stating that "hours worked" under § 207 include "(a) [a]ll time during which an employee is required to be on duty or to be on the employer's premises or at a prescribed workplace and (b) all time during which an employee is suffered or permitted to work whether or not he is required to do so"). Time that an employee spends waiting for work assignments is compensable if the waiting time is spent "primarily for the benefit of the employer and his business." *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir.1992) (quoting *Wantock*, 323 U.S. at 132, 65 S.Ct. 165). The question of whether time is spent predominately for the employer's benefit, and therefore constitutes time "worked" under FLSA, "depends upon particular circumstances." 29 C.F.R. § 785.14. The "[f]acts may show that the employee was engaged to wait," making the time compensable, or that the employee instead "waited to be engaged," rendering the time not compensable. *Skidmore v. Swift & Co.*, 323 U.S. 134, 137, 65 S.Ct. 161, 89 L.Ed. 124 (1944). For example, when periods of inactivity are "unpredictable ... [and] usually of short duration," and the employee "is unable to use the time effectively for his own purposes," then the employee is "engaged to wait," and the inactive time constitutes "work" time under FLSA—even if "the employee is allowed to leave the premises or the job site during such periods of inactivity." 29 C.F.R. § 785.15. On the other hand, when an employee "is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached," then the employee is "waiting to be engaged," and therefore not "work[ing]" under FLSA during that inactive time. 29 C.F.R. § 785.17.

■ The defendants' arguments are well-taken. Moon claims that nearly all of the time spent at the hotel during the night-time hours is compensable, since he was "never off duty" and often slept in the basement near the boiler, which interrupted his sleep. (Pl. Br. 26–27; Moon Aff. ¶ 36.) In support of his argument, he cites an interpretive regulation from the Department of Labor providing that

> [i]f the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22(b). By its terms, however, this regulation applies only to employees who are "on duty for 24 hours or more." As indicated above, the Court does not find Moon to have been "on duty" during the night-time hours except when required to answer emergency calls— which the Court finds to have taken place

only three times per month on average. The fact that Moon was present in the hotel during the periods of inactivity in between his night-time calls does not mean that he was "on duty" during those intervals, since as the Court already has found, the hotel was Moon's *home* during much of the period in question. It necessarily follows that except when called upon to perform lengthy night-time tasks—which are already accounted for in the Court's finding that on *average* Moon's night-time tasks required one hour of his time—the time Moon spent in the hotel was not time spent "primarily for the benefit of the employer and his business." *Owens*, 971 F.2d at 350.

■ At the same time, the circumstances surrounding Moon's evening work activities presents a different situation—while Moon "waited to be engaged" during the night-time hours, the evidence makes clear that he was "engaged to wait" during the evenings. *Skidmore*, 323 U.S. at 137, 65 S.Ct. 161. As the Court has found, Moon routinely was "suffer[ed] or permit[ted] to work" during the evening hours. While the defendants argue that the hotel did not require Moon to spend his evenings in the hotel and that Moon in fact spent much of this time socializing with his friends and coworkers in the hotel basement, rather than actually performing any work, the evidence supports Moon's contention that he was not as free to leave the premises during the evening as the defendants claim and he routinely spent his evenings performing maintenance and repair tasks, typically at the hotel and at Seoul House. Even if Moon did spend some time during the evenings socializing in the hotel while waiting for assignments, that is not sufficient to render that waiting time noncompensable. Moon's "waiting time" during the evening hours was of a different nature than his waiting time during the night-time hours—his work during the evenings was much more frequent than

during the night, and the periods of inactivity during the evenings were considerably shorter, making it far more difficult for him to "to use the time effectively for his own purposes." 29 U.S.C. § 785.15.

Accordingly, the Court concludes that all of the time that Moon worked during the evening and night-time hours and on his days off, as set forth in the Court's findings of fact, is compensable under FLSA and New York law.

B. *"Regular Rate" of Employment*

Since FLSA requires an employer to compensate its employees for overtime "at a rate not less than one and one-half times the regular rate at which he is employed," 29 U.S.C. § 207(a)(1), it is necessary to determine Moon's "regular rate" of pay for the period for which he claims entitlement to damages. The regular rate is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." *Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419, 424, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945). While an employer may agree to compensate an employee with a weekly, monthly, or annual salary, an employee's regular rate is nevertheless an hourly rate of pay, determined by dividing the employee's weekly compensation by the number of hours for which that compensation is intended. 29 C.F.R. § 778.109; 29 C.F.R. § 778.113(a).

FLSA deems the regular rate of pay to include "all remuneration for employment paid to, or on behalf of, the employee," 29 U.S.C. § 207(e), and accordingly, the reasonable cost or fair value of all meals and lodging provided by an employer must be added to the cash wages when calculating an employee's regular rate. 29 C.F.R. 778.116; 29 C.F.R. 778.202; *see Marshall v. Valhalla Inn*, 590 F.2d 306, 308 (9th Cir.1979) (under § 207(e), "reasonable value of the meals" provided by the employer

must be included when calculating the employee's regular rate); *Walling v. Alaska Pac. Consol. Min. Co.*, 152 F.2d 812, 815 (9th Cir.1945) ("[T]he cost of board and lodging customarily furnished employees must also be included in the regular rate."); *McLaughlin v. Quan*, No. 87–A–423, 1988 WL 62595, *4 (D.Colo. June 17, 1988) ("As a general rule, lodging and board provided by an employer to an employee is properly considered a component of the employee's wages, such that the cost of these facilities must be added into the employee's regular rate for purposes of determining the proper overtime rate.").

In view of these principles, and based on the Court's findings of fact, Moon's total weekly compensation, regular rate of compensation, and overtime rate from 1993 until 1999 are as follows:

| Weeks Ending | Weekly Salary | Meals | Lodging | Total Weekly Compensation | Scheduled Hours | Regular Rate | Overtime Rate |
|---|---|---|---|---|---|---|---|
| 1/9/93 – 1/1/94 | $668.64 | $105.00 | $50.00 | $823.64 | 60 | $13.73 | $20.59 |
| 1/8/94 – 9/3/94 | $673.54 | $105.00 | $50.00 | $828.54 | 60 | $13.81 | $20.71 |
| 9/10/94 – 12/31/94 | $673.54 | $105.00 | $162.50 | $941.04 | 60 | $15.68 | $23.53 |
| 1/7/95 – 1/6/96 | $678.54 | $105.00 | $162.50 | $946.04 | 60 | $15.77 | $23.65 |
| 1/13/96 – 1/4/97 | $683.54 | $105.00 | $162.50 | $951.04 | 60 | $15.85 | $23.78 |
| 1/11/97 – 1/3/98 | $717.38 | $105.00 | $162.50 | $984.88 | 60 | $16.41 | $24.62 |
| 1/10/98 – 4/4/98 | $717.38 | $105.00 | $0.00 | $822.38 | 60 | $13.71 | $20.56 |
| 4/11/98 – 6/19/99 | $836.54 | $105.00 | $0.00 | $941.54 | 48 | $19.62 | $29.42 |

### C. *Statute of Limitations*

A cause of action under FLSA accrues "at each regular payday immediately following the work period during which services were rendered." 29 U.S.C. § 255(a). As a general matter, FLSA provides for a two-year statute of limitations on actions to enforce its provisions. However, when the "cause of action aris[es] out of a willful violation," the limitations period is three years from the date on which the claim accrues. 29 U.S.C. § 255(a); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir.1999). Moon contends that the defendants' violations of FLSA were willful, and the Court agrees.

■ In order to conclude that the defendants' violations of FLSA were willful, the Court must find that the defendants either knew or showed reckless disregard for whether their conduct was unlawful under FLSA. *RSR Sec. Servs.*, 172 F.3d at 141 (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)); *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir.1995). While both Kwon and Choi testified that they had knowledge of federal and state minimum wage and overtime laws and consulted outside attorneys for advice on those laws, Choi also admitted that he knew Moon was not paid overtime and that the hotel never was advised by any lawyer that it was permissible not to pay him overtime—indeed, Choi admitted that he made no effort to seek specific legal advice on the issue. (Kwon Decl. ¶ 13; Choi Decl. ¶ 20; Tr. 248–49.) The evidence also makes clear that the defendants also flagrantly violated basic recordkeeping requirements and knowingly paid employees off-the-books in cash without reporting those cash payments to the tax authorities.

Since the defendants knew that they had violated federal and state minimum wage and overtime laws and that they had not compensated Moon in accordance with those laws, the defendants' violations were willful. Accordingly, the defendants are liable under FLSA for violations that accrued during the three years preceding the filing of the original complaint in this ac-

tion on December 6, 1999. *See Chao v. Vidtape,* 196 F.Supp.2d 281, 295–96 (E.D.N.Y.2002) (finding FLSA violations willful where defendants admitted they had knowledge of minimum wage and overtime laws, but committed extensive violations of those laws in any event); *see also Waldbaum,* 52 F.3d at 39–41.

Under New York law, the limitations period for violations of the state's minimum wage and overtime requirements is six years. *See* N.Y. Lab. L. §§ 198(3), 663(3). Accordingly, the defendants are liable under New York law for violations that accrued during the six years preceding Moon's filing of his original complaint on December 6, 1999.

## II. *Calculation of Damages*

As discussed earlier, the Court has found, "as a matter of just and reasonable inference" from the evidence, *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, Moon worked 91 hours per week, on average, between January 1992 and April 1998, and that he worked an additional three evening hours per week during the winter months of November, December, January, February, and March. On average, Moon also worked three night-time hours per month throughout this period, representing an additional 0.75 hours per week. The hotel compensated Moon between January 1992 and April 1998 for 60 hours of work per week, and did not pay him any premium for overtime work. Moon was required to work this same schedule during his vacation time in 1993, 1994, and 1996, but was not required to work any overtime during his three weeks of paid vacation in 1995 and 1997.

Between April 1998 and October 1998, Moon worked on average 64 hours per week, but was compensated for a 48–hour workweek with no premium for overtime work. Between October 1998 and June 1999, when he was transferred to house-keeping, Moon's work schedule, for the most part, is accurately reflected in his time cards. In those limited instances where the starting or ending time of Moon's work day is not indicated on his time card, the Court finds, "as a matter of just and reasonable inference," *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187, that Moon started his work day at 9:00 a.m. and ended his work day at 7:30 p.m., and for those weeks during this period in which time cards are not available at all, the Court finds that Moon worked for 64 hours. In both 1998 and 1999, Moon was able to take three weeks of paid vacation, during which he was not required to work any overtime.

Because Moon was not obligated to work any overtime during his paid vacations, the Court will not calculate damages during those weeks in 1995, 1997, 1998, and 1999. Moon's vacation time appears to be indicated in his time records and paycheck receipts for 1998 and 1999. Since the record does not make clear the particular weeks in which Moon took vacation during 1995 and 1997, the Court will simply calculate damages for those years based on a 52 week year and then credit the defendants for three weeks as indicated below.

■ The defendants argue that they are also entitled to allowances for the reasonable cost of the meals and lodging that they provided Moon, essentially arguing that any liability that they incur for failure to pay overtime should be offset by a credit for the meals and lodging that they provided. (Def.Br. 48–49.) However, this argument misunderstands what FLSA and New York law require. FLSA defines an employee's "wages" to include "the reasonable cost ... to the employer of furnishing such employee with board, lodging, or other facilities" that are "customarily furnished" to its employees. 29 U.S.C. § 203(m). Similarly, New York law pro-

vides that meals and lodging provided by hotels to their employees "may be considered part of the minimum wage" at specific values set forth by regulation. N.Y. Comp.Codes R. & Regs. tit. 12, § 138–2.7(a)–(b). However, "[w]here board, lodging, or other facilities are customarily furnished as addition to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's *regular* rate of pay," not part of his compensation for overtime. 29 C.F.R. § 531.37; *see Alaska Pac. Consol. Min. Co.,* 152 F.2d at 815 ("[I]t seems clear that the cost of board and lodging customarily furnished employees must also be included in the regular rate.").

As the Court already has found, there is no evidence to support a finding that the parties intended and understood the meals and lodging provided to Moon as compensation for *overtime*—rather, these benefits were simply part of Moon's regular weekly salary, just as the cash and checks he received every week were part of that salary. Accordingly, the value of those benefits cannot legitimately be applied under FLSA as a credit against any overtime compensation to which Moon may be entitled any more than the rest of his weekly salary can be so applied. *See Warren–Bradshaw Drilling Co. v. Hall,* 317 U.S. 88, 93, 63 S.Ct. 125, 87 L.Ed. 83 (1942); *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572, 581, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942); *see also Giles v. City of New York,* 41 F.Supp.2d 308, 317 (S.D.N.Y. 1999) ("Unless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours.").

Based on the Court's findings of fact, Moon is owed damages under FLSA and New York law as set forth below.

A. *Weeks Ending December 6, 1993 through December 7, 1996*

Moon is owed damages under New York law for unpaid wages for the weeks ending December 6, 1993, through December 7, 1996, representing (1) the failure to pay him at a premium rate for the 16 agreed-upon hours he worked in excess of 44 per week, and (2) the failure to pay him at all for overtime hours worked in excess of 60 per week. Based on the regular and overtime rates calculated above, the damages owed for this period, as set forth in Appendix A of this opinion, total $135,206.93.

B. *Weeks Ending December 14, 1996 through October 17, 1998*

Moon is owed damages under FLSA for unpaid wages for the weeks ending December 14, 1996, through October 17, 1998, representing (1) the failure to pay him at a premium rate for the 20 agreed-upon hours he worked in excess of 40 per week from December 14, 1996, through April 4, 1998; (2) the failure to pay him at a premium rate for the eight agreed-upon hours he worked in excess of 40 per week from April 11, 1998, through October 17, 1998; (3) the failure to pay him at all for overtime hours worked in excess of 60 per week from December 14, 1996, through April 4, 1998; and (4) the failure to pay him at all for overtime hours worked in excess of 48 per week from April 11, 1998, through October 17, 1998. As indicated in his paycheck receipts, the defendants did pay Moon $1045.80 for overtime for the weeks ending May 23, 1998, through June 20, 1998; accordingly, these payments will be credited against the damages. Based on the regular and overtime rates calculated above, the damages owed for this peri-

od, as set forth in Appendix B of this opinion, total $76,908.65.

### C. *Weeks ending October 24, 1998, through June 19, 1999*

Moon is owed damages under FLSA for unpaid wages for the weeks ending October 24, 1998, through June 19, 1999, representing (1) the failure to pay him in particular weeks at a premium rate for the agreed-upon hours he worked in excess of 40 per week, and (2) the failure to pay him at all in particular weeks for overtime hours worked in excess of 48 per week. Unlike the previous periods, the combination of time cards and paycheck receipts make it possible to determine precisely the hours actually worked for most weeks in this period. Based on these documents and the regular and overtime rates calculated above, the damages owed for this period, as set forth in Appendix C of this opinion, total $13,288.91.

### D. *Liquidated Damages*

#### 1. *FLSA*

■ An employer who violates FLSA's minimum wage and overtime requirements is liable for any unpaid minimum wages or overtime compensation "and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "Liquidated damages" in this context "is something of a misnomer," since "[i]t is not a sum certain, determined in advance as a means of liquidating damages that may be incurred in the future," but rather is "an award of special or exemplary damages added to the normal damages." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1063 n. 3 (2d Cir.1988). *See Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) ("Liquidated damages under the FLSA are considered compensatory rather than punitive in nature.").

Normally, when an employer is found liable for unpaid minimum wages or over-

time, the full award of liquidated damages provided for in the statute is mandatory. However, under section 11 of the Portal-to-Portal Act, the Court has discretion to reduce or deny this liquidated damages award "if the employer shows to the satisfaction of the court that the act or omission giving rise" to the plaintiff's action under FLSA "was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 19 U.S.C. § 260. *See Southern New England Telecomms.*, 121 F.3d at 70–71. The employer bears the "difficult" burden of establishing, by "plain and substantial" evidence, its subjective good faith and objective reasonableness, and as the defendants acknowledge, "[d]ouble damages are the norm, single damages the exception." *Southern New England Telecomms.*, 121 F.3d at 71 (internal quotation marks and citations omitted). *See also Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) (Easterbrook, J.) ("Doubling [damages under FLSA] is not some disfavored 'penalty.' The [Portal–to–Portal Act] made doubling discretionary rather than mandatory, but it left a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith ... and reasonable grounds for believing that [the] act or omission was not a violation.' ").

Here, the Court does not find the defendants' violations of FLSA law to have been in good faith. This is not a case in which the defendants made a good faith effort to comply with FLSA's minimum wage and overtime requirements, but nevertheless inadvertently failed to compensate Moon the money he was owed. To the contrary, the defendants made no effort to comply with basic recordkeeping requirements of federal and state law, paid its employees off-the-books in cash knowing full well that the failure to report such payments violat-

ed federal and state tax laws, and knowingly failed to compensate Moon for extensive overtime work over a period of many years. Accordingly, defendants have not met their burden to establish good faith and reasonable grounds, and the Court therefore lacks discretion, and would in any case decline, to reduce the amount of liquidated damages provided for in the statute. Thus, Moon is entitled to a liquidated damages award of $90,197.55, representing 100 percent of the total wages owed between December 6, 1996, and December 6, 1999.

### 2. *New York Labor Law*

Under the New York Labor Law, an employee may be awarded liquidated damages constituting an additional 25 percent of the total wages owed by the employer "upon a finding that the employer's failure to pay the wage[s] required ... was willful." N.Y. Lab. L. §§ 198(1a), 663. An employer acts "willfully" if it "knowingly, deliberately, or voluntarily disregards its obligation to pay wages." *Ayres v. 127 Restaurant Corp.*, 12 F.Supp.2d 305, 309 (S.D.N.Y.1998) (quoting *P & L Group, Inc. v. Garfinkel*, 150 A.D.2d 663, 541 N.Y.S.2d 535, 537 (2d Dep't 1989)). The plaintiff need not prove that the defendants acted maliciously or in bad faith. *Id.*

As already discussed in connection with the statute of limitations under FLSA, the Court finds that the defendants' failure to pay Moon overtime was willful. Since the standard for willfulness for purposes of the FLSA statute of limitations does not appreciably differ from the standard applicable under New York law when determining whether to award liquidated damages, the Court concludes that Moon is entitled to an award of liquidated damages of $33,801.73, representing 25 percent of the total wages owed between December 6, 1993, and December 6, 1996.

### E. *Failure to Pay for "Spread of Hours"*

New York law requires hotel industry employers to provide an additional hour's pay, at the basic minimum hourly wage rate before allowances, for any day in which the employee's "spread of hours"—defined as "the interval between the beginning and end of the workday," N.Y. Comp. Codes R. & Regs. tit. 12, § 138–4.13—exceeds 10 hours. N.Y. Comp.Codes R. & Regs. tit. 12, § 138–2.6. However, this provision is explicitly limited to non-residential employees, and as already discussed, Moon was a residential employee from January 1992, when he first moved into the hotel, through January 1998, when Kwon sold his interest in Seoul House. Accordingly, Moon's "spread of hours" claim fails as a matter of law for this period.

However, after Kwon sold his interest in Seoul House in January 1998, Moon no longer was a residential employee. Accordingly, the Court concludes that Moon is entitled to an award of $5.15 for each day worked during the weeks ending January 10, 1998, through June 19, 1999. Based on a six day work week for the weeks ending January 10, 1998, through October 17, 1998, and based on the 163 work days for the weeks ending October 24, 1998, through June 19, 1999, on which the Court finds Moon to have worked more than 10 hours, the Court concludes that Moon is entitled to $1,797.35 for these 349 days.

### F. *Summary*

Based on the foregoing calculations, Moon is entitled to a total damages award of $351,201.13, representing (1) compensatory damages of $135,206.93 under the New York Labor Law for unpaid wages for the weeks ending December 6, 1993, through December 7, 1996; (2) liquidated

damages of $33,801.73 under the New York Labor Law for the weeks ending December 6, 1993, through December 7, 1996; (3) compensatory damages of $76,908.65 under FLSA for unpaid wages for the weeks ending December 14, 1996, through October 17, 1998; (4) compensatory damages of $13,288.91 under FLSA for unpaid wages for the weeks ending October 24, 1998, through June 19, 1999; (5) liquidated damages of $90,197.55 under FLSA for the weeks ending December 14, 1996, through June 19, 1999; and (6) damages of $1,797.35 under New York law for the failure to compensate Moon for 349 work days during the weeks ending January 10, 1998, through June 19, 1999, on which his "spread of hours" exceeded 10 hours.

### III. *Joint and Several Liability*

Moon contends that the evidence demonstrates that even though he was nominally employed by the hotel, which was operated by 43 West and Stanford, the remaining defendants—Kwon, Beautri, Central, and Han Ah Reum—should be held jointly and severally liable with the hotel as joint employers. These defendants (except for Beautri, which has defaulted) dispute this contention, arguing that even when Moon performed work at Seoul House, the 41st Street Building, Han Ah Reum, and Kwon's residence, he did so in his capacity as an employee of the hotel.

To be held liable under FLSA, a person must be an "employer," which the statute defines more broadly than the common law to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." [17] 29 U.S.C. § 203(d); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir.1999). When determining whether a given person is an "employer" for purposes of FLSA,

"the overarching concern is whether the alleged employer possessed the power to control the workers in question, ... with an eye to the 'economic reality' presented by the facts of each case." *RSR Sec. Servs.*, 172 F.3d at 139 (quoting *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)). *See Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir.1983) ("In determining employer status" under FLSA, " 'economic reality' prevails over technical common law concepts of agency." (citation omitted)).

This focus on the power to "control" the employees "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitation on control 'do[ ] not diminish the significance of its existence.' " *RSR Sec. Servs.*, 172 F.3d at 139 (quoting *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir.1982)). Relevant factors under this "economic realities" standard include "whether the alleged employer had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 12 (2d Cir.1984)). The list of factors is not exhaustive, and no individual factor standing alone is dispositive. Rather, whether a particular individual is an "employer" under FLSA is determined, after examining "any relevant evidence," based on the totality of the circumstances. *Id.*

Given this broad definition of "employer," an individual may simultaneously have

---

**17.** New York law adopts a similarly broad definition of "employer" in the context of its minimum wage and overtime laws. *See* N.Y. Lab. L. §§ 2(6), 651(6).

several employers for purposes of FLSA. *Agnew,* 712 F.2d at 1511; *see Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 675 (1st Cir.1998). As set forth in the Department of Labor's interpretive regulations of FLSA, two or more employers may be found to be "joint employers" where an employee "performs work which simultaneously benefits two or more employers, or works at two or more employers at different times during the workweek," including, for example:

(1) Where there is an arrangement to share the employee's services, as for example to interchange employees; or

(2) Where one employer is acting indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of an employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b) (citations omitted). If the facts demonstrate that the employee is jointly employed by more than one employer, then "all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of [FLSA]." 29 C.F.R. § 791.2(a).

 Here, there is no question that the "economic realities" of Moon's relationship with Kwon, the president of the hotel, render Kwon an employer of Moon under FLSA. "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Ag-*

*new,* 712 F.2d at 1511 (citing cases). *See also RSR Sec. Servs.,* 172 F.3d at 139–41; *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965–66 (6th Cir.1991); *Donovan v. Grim Hotel Co.,* 747 F.2d 966, 971–72 n. 7 (5th Cir.1984). Kwon hardly was a distant corporate officer, with no role in setting the terms and conditions of employment for employees such as Moon. To the contrary, Kwon played an intimate role in the day-to-day operations of the hotel, regularly working out of an office in the hotel, supervising and determining Moon's work responsibilities and employment conditions, and even claiming to have personally hired him and arranged housing for him. The fact that Kwon may have shared or delegated operational control to other hotel managers, or exercised that control infrequently, is of no consequence. *See, e.g., RSR Sec. Servs.,* 172 F.3d at 139 ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence." (internal quotation marks and citations omitted)); *Carter,* 735 F.2d at 13 ("[T]he fact that control over a worker may be qualified is not a sufficient factor, in and of itself, to place an employment relationship beyond the scope of the FLSA.").

Moreover, Kwon's control of Moon's employment conditions and day-to-day responsibilities was not limited to Moon's work at the hotel, but extended to the affiliated locations where Kwon and other hotel employees directed him to work. Kwon had a direct personal interest in Seoul House, the 41st Street Building, and obviously his own apartment, and an indirect personal interest in Han Ah Reum, which was owned by his brother. By personally directing Moon to perform work at these affiliated locations—at times even accompanying him to those locations when making these assignments—Kwon exer-

cised sufficient control over the terms of Moon's employment so as to make him Moon's "employer" within the meaning of FLSA.

The facts also demonstrate rather decisively that Beautri, Han Ah Reum, and Central, together with the hotel and Kwon, constitute Moon's joint employers.[18] Indeed, this case presents a paradigmatic example of joint employment under FLSA. First, the evidence makes clear that Kwon, Beautri, Han Ah Reum, and Central shared Moon's maintenance and repair services with the hotel, often directly instructing him to work at locations other than the hotel and essentially treating him as a shared employee. 29 C.F.R. § 791.2(b)(1). Second, each defendant acted "directly or indirectly in the interest of the other[s]." 29 C.F.R. § 791.2(b)(2). Moon's hotel supervisors not only accommodated Moon's work assignments at Seoul House, the 41st Street Building, and Kwon's apartment, but often actively instructed Moon to perform these off-site tasks. While the evidence belies the defendants' assertion that Moon's work at these affiliated locations took place only in his capacity as a hotel employee, it does not particularly matter, for it is clear that Moon's work at these locations was in the interests of the other defendants, rather than the hotel. Finally, the defendants are anything but "completely disassociated" with respect to Moon's employment. 29 C.F.R. § 791.2(b)(3). To the contrary, the defendants clearly shared control over Moon's employment activities—primarily, though not exclusively, through the pivotal role of Kwon, who played a hands-on role directing Moon's employment activities at the hotel, Seoul House, and the 41st Street Building and almost certainly exercised in-

direct influence, if not control, over Moon's work at Han Ah Reum.

Given the facts of this case, it is hardly surprising that the defendants stipulated that Stanford, 43 West, Central, and Han Ah Reum collectively constitute an "enterprise" within the meaning of FLSA. *See* 29 U.S.C. § 203(r)(1) (defining "enterprise" to mean "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, ... whether performed in one or more establishments or by one or more corporate or other organizational units"); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 694 (3d Cir.1994). The Court concludes that all of the defendants are liable as joint employers for the failure to pay Moon overtime.

### CONCLUSION

Accordingly, for the foregoing reasons, the Court concludes that Moon has proven, by a preponderance of the evidence, that the defendants violated FLSA and the New York Labor Law by failing to pay Moon for his overtime work and failing to compensate him adequately for work days in which his "spread of hours" exceeded 10 hours. For these violations, the Court awards Moon damages totaling $351,201.13, as calculated and set forth in Part II above, for which the defendants are jointly and severally liable.

Moon shall submit an application for the amount of its fees and costs, a request for prejudgment interest, and an appropriate form of a judgment no later than September 23, 2002. The defendants shall submit any opposition to Moon's submission no later than October 15, 2002.

SO ORDERED.

---

18. Since Beautri has been served with notice of its default, the Court deems its liability as a joint employer established. *See Chen v. Jenna Lane, Inc.*, 30 F.Supp.2d 622, 623 (S.D.N.Y.

1998). In any event, as discussed in the text, the evidence fully establishes such liability.

## APPENDIX A
### Damages Owed Under New York Law for
### Weeks Ending December 6, 1993, through December 7, 1996

| Pay Periods Ending | Weeks | Scheduled Hours | Total Hours | Overtime Hours - No Premium | Overtime Hours - Not Paid At All | Regular Rate | Overtime Rate | Total Owed |
|---|---|---|---|---|---|---|---|---|
| 12/6/93 – 1/1/94 | 4 | 60 | 94.75 | 16 | 34.75 | $13.73 | $20.59 | $3,301.05 |
| 1/8/94 – 3/26/94 | 12 | 60 | 94.75 | 16 | 34.75 | $13.81 | $20.71 | $9,960.87 |
| 4/2/94 – 9/3/94 | 23 | 60 | 91.75 | 16 | 31.75 | $13.81 | $20.71 | $17,662.68 |
| 9/10/94 – 10/29/94 | 8 | 60 | 91.75 | 16 | 31.75 | $15.68 | $23.53 | $6,981.42 |
| 11/5/94 – 12/31/94 | 9 | 60 | 94.75 | 16 | 34.75 | $15.68 | $23.53 | $8,489.41 |
| 1/7/95 – 3/25/95 | 12 | 60 | 94.75 | 16 | 34.75 | $15.77 | $23.65 | $11,375.01 |
| 4/1/95 – 10/28/95 | 31 | 60 | 91.75 | 16 | 31.75 | $15.77 | $23.65 | $27,185.99 |
| 11/4/95 – 1/6/96 | 10 | 60 | 94.75 | 16 | 34.75 | $15.77 | $23.65 | $9,479.18 |
| [Vacation - 1995] | -3 | 60 | 94.75 | 16 | 34.75 | $15.77 | $23.65 | ($2,843.75) |
| 1/13/96 – 3/30/96 | 12 | 60 | 94.75 | 16 | 34.75 | $15.85 | $23.78 | $11,438.82 |
| 4/6/96 – 10/26/96 | 30 | 60 | 91.75 | 16 | 31.75 | $15.85 | $23.78 | $26,456.85 |
| 11/2/96 – 12/7/96 | 6 | 60 | 94.75 | 16 | 34.75 | $15.85 | $23.78 | $5,719.41 |
| | | | | | | | TOTAL: | $135,206.93 |

## APPENDIX B
### Damages Owed Under FLSA for
### Weeks Ending December 14, 1996, through October 17, 1998

| Pay Periods Ending | Weeks | Scheduled Hours | Total Hours | Overtime Hours - No Premium | Overtime Hours - Not Paid At All | Regular Rate | Overtime Rate | Total Owed |
|---|---|---|---|---|---|---|---|---|
| 12/14/96 – 1/4/97 | 4 | 60 | 94.75 | 20 | 34.75 | $15.85 | $23.78 | $3,939.82 |
| 1/11/97 – 3/29/97 | 12 | 60 | 94.75 | 20 | 34.75 | $16.41 | $24.62 | $12,236.94 |
| 4/5/97 – 10/25/97 | 30 | 60 | 91.75 | 20 | 31.75 | $16.41 | $24.62 | $28,376.55 |
| 11/1/97 – 1/3/98 | 10 | 60 | 94.75 | 20 | 34.75 | $16.41 | $24.62 | $10,197.45 |
| [Vacation - 1997] | -3 | 60 | 94.75 | 20 | 34.75 | $15.77 | $23.65 | ($2,938.31) |
| 1/10/98 – 4/4/98 | 12 | 60 | 94.75 | 20 | 34.75 | $13.71 | $20.56 | $10,217.52 |
| 4/11/98 – 10/17/98 | 29 | 48 | 64 | 8 | 16 | $19.62 | $29.42 | $15,924.48 |
| Overtime Credit - 5/23/98 – 6/20/98 | -5 | | | | | | | ($1,045.80) |
| | | | | | | | TOTAL: | $76,908.65 |

## APPENDIX C
### Damages Owed Under FLSA for
### Weeks Ending October 24, 1998, through June 19, 1999